GULF SHORES COUNCIL OF CO–OWN-
ERS, INC., Donald R. Comuzzi, and
Marjorie C. Peterson, Appellants,

v.

The RAUL CANTU NO. 3 FAMILY
LIMITED PARTNERSHIP,
Appellee.

No. 13–97–353–CV.

Court of Appeals of Texas,
Corpus Christi.

Jan. 28, 1999.

Rehearing Overruled March 4, 1999.

Deborah R. Sundermann, Attorney at Law, F. Edward Barker, Barker & King, R. Bryan Stone, Stone & Stone, Corpus Christi, for Appellant.

Russell Manning, Hornblower, Manning & Ward, Corpus Christi, for Appellee.

Before Chief Justice SEERDEN, and Justices DORSEY, and CHAVEZ.

## OPINION

DORSEY, Justice.

In this case we interpret the Declaration of Condominium of the Gulf Shores Condominium complex and its Bylaws to determine

whether the Gulf Shores Council of Co–Owners, Inc., could levy fees upon condominium unit owners who rented their units outside a rent pool and whether it could prohibit owners from using outside leasing agents to manage their units. Following a jury trial the court declared the fees and prohibition unenforceable. It also awarded damages to the Raul S. Cantu No. 3 Family Limited Partnership based upon the jury's findings that appellants had tortiously interfered with its contracts to rent and manage its units. Appellants appeal the entire verdict. We reverse and render.

In 1979 a developer executed the Declaration of Condominium (Declaration) establishing the Gulf Shores condominium project in Port Aransas, Texas. The Declaration created the Council of Co-owners as a membership association to act for the benefit of all unit owners in the project. A board of directors (Board) managed the Council and its affairs. Donald Comuzzi served as the Board's chairman, and Marjorie Peterson managed the project.

In 1980 Dr. Raul S. Cantu and his wife bought units 405, 509, and 209 in the Gulf Shores project. The Cantus bought the units for investment purposes and placed them for rent in the Gulf Shores' rent pool. Gulf Shores managed and rented out the units in the pool, charging a fee of forty percent of the rents received. Thus, forty percent of the rent was withheld to pay for the expenses incidental to renting the units, and the remaining sixty percent was divided among the pool participants.

In November 1993, Dr. Cantu withdrew the units from the pool and contracted with Samantha Lawson at Rental Management Company to manage them. Also in that month the Board enacted a policy regulating the renting of units outside the rental pool and levied fees on those units. These fees were intended to cover the additional expenses caused by renters. Dr. Cantu was present and voted at this meeting. The Council imposed this fee beginning in May 1994.

Apart from the fees charged by the rent pool or on units rented outside the pool, the Declaration and Bylaws of the Council required each unit owner to pay ½₂ of the project's common expenses, there being fifty-two units in the project. Dr. Cantu paid this amount, but he refused to pay the fees levied against him for renting outside the pool.

The Council claimed numerous problems erupted when Lawson began managing the Cantu units, despite the regulations that had been adopted. These problems were discussed at the owners' annual meeting in October 1995, and the Board recommended an amendment to the Declaration prohibiting any owner from using an outside leasing agent, such as Lawson, to manage unit rentals. Under the proposal an owner could rent his units either personally or through the rent pool, but not through anyone else. The proposal passed, although Dr. Cantu maintains this action was invalid due to noncompliance with statutory requirements.

The Partnership sued the Council, Comuzzi, and Peterson (appellants) for damages and a declaratory judgment to declare the fees and the prohibition against outside leasing agents invalid. It also sought to declare the Council, by enacting the restrictions and enforcing them, tortiously interfered with its contracts with its tenants and Lawson.

Following a jury verdict favorable to the Partnership, the trial court rendered judgment for it for $40,000 in actual damages and $2,999.92 in prejudgment interest from appellants. This amount included lost rentals and expenses. The court also awarded exemplary damages to the Partnership of $100,000 against the Council, $25,000 against Comuzzi, and $15,000 against Peterson. It also awarded the Partnership attorney fees of $80,000.

We will consider the evidence in this case according to the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *see also* Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 TEX. L. REV. 361 (1960).

### A. Absolute Right To Lease

■ In its judgment the court found the Declaration was *unambiguous* with respect to the contested issues for interpretation, and it found the "absolute right to lease" provi-

sion of section 5.02 of the Declaration constituted a right in the project which was appurtenant to the Cantu units, under section 1.05(c) of the Declaration. The court held that this right to lease included the unfettered right of an owner to choose an independent manager to manage and rent its units.

Courts have recognized the unique nature of condominium ownership and its problems. The owners make up a democratic subsociety more restrictive in the use of condominium property than property owners might accept in traditional forms of property ownership. Each owner must give up some historic rights of property ownership and the freedom of use of the property and subordinate those traditional ownership rights when electing to own a condominium unit. *See Raymond v. Aquarius Condominium Owners Ass'n, Inc.,* 662 S.W.2d 82, 89 (Tex. App.—Corpus Christi 1983, no writ); *Board of Dir. of By The Sea Council of Co-Owners, Inc. v. Sondock,* 644 S.W.2d 774, 780–81 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.); *Seagate Condominium Ass'n, Inc., v. Duffy,* 330 So.2d 484, 486 (Fla.App.1976); *Hidden Harbour Estates, Inc. v. Norman,* 309 So.2d 180, 182 (Fla.App.1975).

In the instant case section 5.02 of the Declaration stated "[e]ach Apartment [unit] Owner shall have an absolute right to lease or rent his apartment upon such terms as he shall approve, subject to all provisions and restrictions applicable to the Project." The term "absolute right" is limited by "subject to all provisions and restrictions applicable to the Project." Because the right to lease is subject to restrictions, it cannot be said to be truly absolute and without limit.

■ When a dispute arises about the terms of a contract, and the contract is not ambiguous, we can determine the parties' rights and obligations under the agreement as a matter of law. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). When parties have entered into an unambiguous writing the courts will give effect to the parties' intention as expressed or as is apparent in the writing. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). In *Mercer v. Hardy,* 444 · S.W.2d 593 (Tex.1969) the court said, "Ap-

parently inconsistent provisions of a contract must be harmonized if possible in order to effectuate the intention of the parties, and 'an interpretation will not be given to one part of a contract which will annul another part of it.'" *Mercer,* 444 S.W.2d at 595.

Applying these rules we interpret the language of section 5.02 to mean the units were not limited to owner occupancy, but could be occupied by tenants. The unit owners may make their apartments available for lease or rent, subject to reasonable restrictions. This right does not give an owner an absolute right to lease his unit without any restrictions; but rather the right is "subject to *all* provisions and restrictions applicable to the project." (emphasis added). The ability to have tenants is guaranteed by the "absolute right" language. This interpretation harmonizes the provisions of section 5.02 and does not prevent an owner from renting or leasing her units. We hold the trial court erred when it found the "absolute right to lease" provision of section 5.02 included the right to choose an independent manager to manage units at Gulf Shores.

### B.  The Prohibition and Fees

The trial court declared the Board's decision to levy fees upon owners renting outside the pool and to prohibit the use of outside leasing agents was arbitrary, capricious, or discriminatory, and therefore, unenforceable. Questions One and Two asked the jury whether the fees and prohibition were arbitrary, capricious, or discriminatory. The jury answered "Yes" to both questions.

■ A condominium association has considerable discretion to determine the necessary expenses for the operation of the condominium project and to assess the owners' *pro rata* share of the common expenses. *San Antonio Villa Del Sol Homeowners Ass'n v. Miller,* 761 S.W.2d 460, 464 (Tex.App.—San Antonio 1988, no writ); *Pooser v. Lovett Square Townhomes Owners' Ass'n,* 702 S.W.2d 226, 231 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Raymond,* 662 S.W.2d at 89. We apply a "reasonableness" standard when reviewing the action of a condominium association or its board of di-

rectors, recognizing they may not enforce arbitrary, capricious, or discriminatory rules. *See Miller,* 761 S.W.2d at 465; *Pooser,* 702 S.W.2d at 231; *Raymond,* 662 S.W.2d at 89. They can only assess services reasonably as necessary to achieve the purpose of creating a uniform plan for the development and operation of the condominium project. *See Raymond,* 662 S.W.2d at 89–90; *Ryan v. Baptiste,* 565 S.W.2d 196, 198 (Mo.App.1978).

■ The condominium declaration constitutes the basic rules for governance of the condominium project. Section 1.07 of the Declaration provided the project and the purchase and ownership of each apartment and interest in the general common elements were subject to all of the Declaration's provisions, the Council Articles of Incorporation, Bylaws, and any project rules and regulations, which are now or may hereafter be adopted. Section 2.01 stated the Council shall administer the common elements and govern the project, acting for the benefit of all unit owners "to provide for the protection, preservation, maintenance and repair of the General Common Elements and the operation, management and administration of the Project...." Section 4.02 gave the Council the power to "assess the Apartment Owners for their respective Shares of Common Expenses and *otherwise* as herein provided. The making and collection of assessments against Apartment Owners for Common Expenses shall be subject to the Bylaws ...." (emphasis added).

The Bylaws, in Section 2.5, gave the Board the power "to assess and fix charges to be levied against the members of the corporation; *and to exercise such other powers as may be necessary or proper to attain the object of the corporation. ...*" (emphasis added). Section 4.1 of the Bylaws provided the Board shall have full power and authority to charge or assess the members of the corporation for funds required for the performance of its objects and purposes as set forth in the Declaration.

The Council had the power to assess the unit owners for their share of the common expenses "and otherwise as herein provided" under those provisions. The Bylaws gave the Board the power to exercise powers nec-

essary or proper to obtain the object of the corporation. Therefore, the Council and Board have the authority to levy fees against owners renting outside the pool and prohibit owners from using outside leasing agents, assuming the prohibition and fees were reasonably necessary to achieve the purpose of creating a uniform plan for development and operation of the condominium project. *See Raymond,* 662 S.W.2d at 89–90; *Ryan,* 565 S.W.2d at 198.

■ We will review the evidence to determine if the prohibition against using an outside rental agent and the fees assessed were reasonably necessary to the operation of the condominium project; or, conversely, whether there is any evidence to support the jury's verdict that the assessment, restrictions, and prohibition were arbitrary, capricious and discriminatory.

In November 1993 the Board adopted a policy assessing rules and fees on units being rented that were not in the rent pool and began enforcing that policy on May 26, 1994. At the annual meeting in October 1995 the Council of Co–Owners declared that units could not be rented through agents other than the rent pool.

Section 1(a) of the rules that went into effect in 1994 stated "Owners or their Rental Agents will advise the Gulf Shores management office of guest name and date of arrival and departure in advance." Marjorie Peterson, Gulf Shores' manager, testified there were four or five times in 1994 and several times in 1995 when Gulf Shores did not have advance notice about guests renting the Cantu units.

Section 1(b) stated the condominium office would issue all keys and parking permits during normal office hours. It also required guests to register at the office upon arrival and departure from the condominium complex. The evidence showed some guests did not register. Section 2 stated all maids and maintenance personnel must report to the condominium office for permission to enter the premises and present proof of workers compensation and liability insurance. Peterson testified the maids and maintenance personnel did not always adhere to this policy.

She said this policy was important because Gulf Shores needed to know who was on its premises. Section 3 required signs be posted inside the apartment on the door, stating the rental agent's name, the telephone number of a contact should a problem arise with the accommodations, the extent of maid service provided by the agent, and unpaid phone calls will be billed to the owner. According to Peterson the guests who stayed in the apartments said the signs were not posted. Section 4 stated "A duplicate of this information must be submitted to the Gulf Shores Manager and will be kept on file in the Gulf Shores office at the time your apartment begins renting. A copy will be given to each guest at registration." The evidence showed Gulf Shores did not receive this information.

Gulf Shores had other problems with Lawson. For instance, Albert Davila, a unit owner at Gulf Shores, saw a man and a woman and two police officers trying to pry open the door to one of the Cantu units between 11 p.m. and midnight. They informed Davila their key did not work and that they were there to clean the unit.

Lawson did not always advise guests that Gulf Shores would not provide them with maid service. When guests in the Cantu units complained to Gulf Shores' management about various problems with their units, management had to refer them to Lawson because the units were not part of the rent pool. Some of the problems with the Cantu units occurred after 5:00 p.m., when Lawson or her agents were unavailable. When Gulf Shores' personnel tried to report problems to Lawson, they frequently could not find anyone to respond.

On April 9, 1995, Peterson sent Lawson a letter, informing her of incidents concerning the guests in the Cantu units. The letter included: March 19, 1995, a fight on the beach, guests were from unit 509; April 2, 1995, guests appeared to have deliberately set two commodes in unit 405, causing the water to run; April 7, 1995, around midnight Comuzzi saw persons urinating off the balcony of unit 209; and on April 8, 1995, Albert Davila, Jr., and Orlando Peterson asked the guests in unit 209 to quiet down, people could hear the guests hollering throughout the area. The letter also showed Gulf Shores had a problem with cleaning staff arriving at late hours.

Marjorie Peterson's testimony showed the reason for the prohibition against outside leasing agents was due to the problems Gulf Shores had with renters, and Lawson's failure to respond to the problems.

Donald Comuzzi explained the Board's decision to prevent use of outside leasing agents. His testimony showed the Board was "terribly frustrated" with trying to manage and control security over the premises with an outside leasing agent. The Board had no authority over the agent, and the agent refused to abide by Gulf Shores' rules and regulations. He gave examples showing how the outside agent broke Gulf Shores' rules. The agent did not follow the rule requiring unrelated third parties who were paying to enter the premises to obtain a key from the office. The agent also failed to provide bonded cleaning staff to clean the Cantu units. The leasing agent had cleaning people on the premises late at night. Gulf Shores' management had difficulty maintaining proper decorum among the guests because the leasing agent was not always available to the guests being placed in the units. Guests became irate upon discovering their units were not properly cleaned or did not have clean towels.

Concerning assessment of the fees on owners who did not rent through the pool, Comuzzi said Mr. Gilully, who once was Board chairman, introduced the idea about some owners abusing their ownership rights by renting outside the pool. Comuzzi thought the dollar amount the Board decided to charge was a culmination of many, many hours of meetings, deliberations, and studies between the Board and other owners. They looked at what costs renters would generate compared to costs an owner would not generate. He said more renters used the property than owners. They tried to arrive at a fair and equitable figure which would compensate for the increased wear and tear due to the increased traffic. Comuzzi testified the rent pool charged fees to pay for advertising, added wear and tear on the elevators, additional lighting and security, cleaning and

maintenance of the property, additional management expenses, and to provide for lighted highway signs for the renters' benefit. Gulf Shores charged the rental charge to everyone who rented. If the party was in the rent pool Gulf Shores deducted the charge from their proceeds. The charges were part of the forty percent which Gulf Shores kept to cover expenses. The $20–per–day fee (later reduced to $15) charged to third-party renters during the high season was equivalent to the fee paid by members of the rent pool for maintenance and upkeep.

Peterson said she was paid a portion of the rental fee because she was the "manager on board" and oversaw the condominium building.

Dr. Cantu believed the prohibition against outside leasing agents was arbitrary and capricious because he did not think it was easy for any person who lived 150 miles away (the Cantus lived in San Antonio) from the project to be renting any units. He said it was capricious because he thought a trained management agent would do a better job than an owner because if the agent did not do the job the agent would be fired and the business given to someone else. He said the prohibition was discriminatory because "it's only to me." When counsel asked Dr. Cantu why he believed the outside rental charges were arbitrary and capricious, he said, "[T]hey pulled a number out of the air without any reason, without any specific facts to support the decision." He believed these charges were discriminatory because "they are not charged to all the owners and if I accept it I will be paying more than the ½₂ portion that I should be paying."

Lawson's testimony showed during the entire year she was accessible at night and on weekends and holidays. Her office was open during the day, and she used an answering machine when she was out of the office. She also had an answering service. Her company always had someone available when paged. Further, Lawson denied Peterson's allegations about her failure to comply with the Council's rules. Her testimony showed she complied with the Council's rules.

For the assessment of the fee or the later prohibition against the use of outside rental agents to be arbitrary, capricious, or discriminatory, there must be evidence that the governing board acted without a reason related to the sound governance of the entire condominium project. The only evidence that supports the jury's finding of such is the testimony of Dr. Cantu, who opined the charges were arbitrarily set because they "were just pulled out of the air," and that they were discriminatory because they applied only to him. There is no evidence to support Dr. Cantu's opinion that the amount of the fee was chosen arbitrarily, but rather, that the Council deliberated at length on the subject, and once it had been set, reduced it upon reconsideration.

That the charges applied only to Dr. Cantu's units is no evidence of discrimination, in that his were the only units in the project that rented outside the rent pool using an independent leasing agent. We conclude the prohibition and fees were necessary to achieve the purpose of creating a uniform plan for the development and operation of the condominium project. See Raymond, 662 S.W.2d at 89–90; Ryan, 565 S.W.2d at 198. We hold there is no evidence to support the jury's conclusion that the assessment of the fee and later prohibition against the use of outside rental agents was arbitrary, capricious, and discriminatory. We hold the trial court erred by declaring the prohibition and assessments unenforceable.

In its judgment the trial court declared the amendment prohibiting the use of outside leasing agents was invalid as a matter of law because a meeting of the owners at which sixty-seven percent of the ownership interests in Gulf Shores did not approve the amendment as required by section 81.111 of the Texas Property Code. See Tex. Prop. Code Ann. § 81.111 (Vernon 1995). Because section 5.02 does not give unit owners an absolute right to lease or rent their units the Council did not have to amend the Declaration in order to forbid owners from using outside leasing agents. The Council could enforce this rule as part of its authority found in the Declaration to operate, manage, and administer the project.

### C. Tortious Interference

In its suit the Partnership alleged the Council had tortiously interfered with its contracts in three respects. First, the Council interfered with the Partnership's contractual, absolute right to rent by trying to assess the fees and by prohibiting the use of third-party leasing companies. Second, the Council interfered with the Partnership's existing contracts with its renters. Third, the Council interfered with the Partnership's contract with its leasing agent, Rental Management Company. It alleged Comuzzi and Peterson were liable as joint tortfeasors for having instigated, aided, and knowingly participated in the Council's tortious conduct.

Question Three asked the jury whether the Council, Comuzzi, or Peterson "intentionally interfere[d] with the existing management contract between the Raul S. Cantu No. 3 Family Limited Partnership and the Rental Management Company?" Question Five asked whether the Council, Comuzzi, or Peterson "intentionally interfere[d] with existing rental contracts between The Raul S. Cantu No. 3 Family Limited Partnership and renters?" The jury found that the Council, Comuzzi, and Peterson had interfered with the existing management contract and existing rental contracts.

By their answers to Questions Four and Six the jury found that the Council, Comuzzi, and Peterson were not justified in interfering with the above-mentioned contracts.

A tortious interference cause of action is established if the plaintiff proves: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss resulted. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996) (per curiam); *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). Even if a plaintiff establishes the elements of this cause of action a defendant may still prevail upon establishing the affirmative defense of justification. *Texas Beef*, 921 S.W.2d at 210. A party is justified in interfering with another's contract if it exercises (1) its own legal rights or (2) a good-faith claim to a colorable legal right, even

though that claim ultimately proves to be mistaken. *Friendswood*, 926 S.W.2d at 282; *Texas Beef*, 921 S.W.2d at 211.

In *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989) the court concluded that the privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof. *Sterner*, 767 S.W.2d at 689–90. The *Sterner* court said: "The party asserting this privilege does not deny the interference but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract." *Sterner*, 767 S.W.2d at 690.

In *Calvillo v. Gonzalez*, 922 S.W.2d 928 (Tex.1996) (per curiam) the court stated that in a tortious interference case a defendant's motivation behind the assertion of a legal right is irrelevant since the right conclusively establishes the justification defense. *Calvillo*, 922 S.W.2d at 929. Good faith is not a relevant factor in determining justification if the defendant acts to assert a legal right. *Calvillo*, 922 S.W.2d at 929.

Concerning motivation, the supreme court has stated:

> Improper motives cannot transform lawful actions into actionable torts. " 'Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.' "

*Texas Beef*, 921 S.W.2d at 211 (citations omitted). This quotation shows that motivation is not an element of the tort itself or of justification.

In the instant case the evidence showed Dr. Cantu had not paid the assessments levied upon him for renting outside the rent pool. His failure to pay the rental fee formed the basis for the Council's threat to terminate utilities to the Cantu units. The Council sent a letter dated December 1, 1995, and directed to Dr. Cantu's attorney, David Conoly, threatening to terminate the telephone and water service to Cantu's three

rental units. Dr. Cantu advised his property manager, Samantha Lawson, of the threat and, as a result, she was forced to terminate existing contracts for the lease of the rental units. She was unable to rent the units with the impending threat of termination of services. Further, she removed the rental units from the market for seven months, testifying that the failure to advertise the units during the period of the dispute dramatically reduced the occupancy rate of the units. Lawson further testified the long period of no occupancy incurred $968.11 in maintenance costs to rejuvenate the units. Dr. Cantu introduced evidence showing the rental period and associated costs in which the units were vacant as a direct result of the Council's threat to terminate utilities. Lawson testified that the same units in the year prior had earned $29,000 from December 1994 through June of 1995. She testified the other properties she managed increased by a factor of at least twenty-one percent during the same period. She estimated the shut-out of the units cost $40,644 in lost revenues. She estimated the loss of an additional $9,345 for reduced rentals based on loss of advertising during that period. On May 26, 1996, Dr. Cantu received a letter from the Council's attorney that, because he had brought his back payments current, the threat to terminate services was removed. Nonetheless, Dr. Cantu pursued a temporary restraining order, which the Council resisted, to forbid the Council from terminating services. Dr. Cantu testified that the Council's resistance to the TRO, and the possibility that they might prevail, limited him to short-term rentals of the property pending resolution of the lawsuit. He lost long-term rental business.

The Partnership argues that Peterson and Comuzzi took affirmative steps to convince the Board and the owners to adopt and enforce the "unlawful rental fee" that the Council tried to collect by threatening to cut off Dr. Cantu's utilities. Some of the action they took to persuade the directors and owners included making false reports of incidents with Lawson's and Dr. Cantu's tenants. This conduct was directed specifically at Dr. Cantu and Lawson, and went beyond the good-faith performance of their duties for the Council.

The Council asserts Dr. Cantu owed back assessments at the time it sent its threat letter. Dr. Cantu was assured, they claim, that his utilities would not be turned off. When he sought assurances to that effect, he was rebuffed in a letter dated April 3, 1996, in which the Council's attorney, Ed Barker, informed Conoly that the Council would make no such assurances.

Regarding Dr. Cantu's assertions that Comuzzi and Peterson should be held personally liable for their acts of interference the Council points to Dr. Cantu's testimony in which he asserted that he is aware of no specific instances in which either Comuzzi or Peterson acted outside the course and scope of their employment. Peterson testified she never acted outside the scope of her duties and that neither she nor Comuzzi, to her knowledge, individually benefitted from their actions.

The Partnership argues that the attempts to amend the Declaration and the resulting threats to terminate utilities to the Cantu units were unlawful because the rental fees and Declaration amendment that formed the basis for their actions were unlawful. We disagree.

As previously stated the Partnership did not have an absolute right to lease its units. The Council had a legal right, under the Declaration, to assess fees against owners who rented their units outside the pool and to prohibit the owners' use of third-party leasing agents.

Section 7.05 of the Declaration of Condominium stated the Board "shall have the right to enforce by any proceedings at law and equity" all the Declaration's provisions. Section 2.5 of the Bylaws stated the Board shall have the power to prescribe and enforce penalties for violations of the rules and Bylaws and to exercise the necessary powers to attain the object of the corporation.

The Council's letter threatening to terminate utilities was a legitimate means to encourage the Partnership and Dr. Cantu to pay the assessed fees. The Council had the power to enforce penalties for violations of the rules. The Partnership and Dr. Cantu

had violated these rules by not paying the fees and using a third-party leasing agent. The evidence showed that the Partnership's contracts with renters and its outside leasing agent impaired the legitimate interest the Council had in maintaining and operating the condominium project. Because appellants conclusively established they had a legal right to interfere with the Partnership's contracts they conclusively established the justification defense. *See Calvillo,* 922 S.W.2d at 929; *Texas Beef,* 921 S.W.2d at 211; *Central Sav. & Loan Ass'n v. Stemmons Northwest Bank,* 848 S.W.2d 232, 241 (Tex.App.—Dallas 1992, no writ) (plaintiff cannot recover for tortious interference with contract or business relations if the allegedly interfering third party acted to protect its legitimate interest).

### D.  Malice

By its answer to Question Ten the jury found the Council, Peterson, and Comuzzi acted with malice. The Partnership points to several incidents which it claims showed that Peterson and Comuzzi acted with malice. For example, Peterson allowed the Cantu units to deteriorate and did not inform Dr. Cantu about the problem, Peterson refused to speak personally to Dr. Cantu by telephone, when Dr. Cantu removed his units from the rent pool, Peterson removed towels, sheets, kitchen utensils, and other items from the units, Peterson refused to allow exterminators into the Cantu units, and Peterson was rude and spiteful to Dr. Cantu's guests. Comuzzi had instructed the rental managers in the past that apartments should not be rented to Mexican nationals (Dr. Cantu was from Mexico), Comuzzi was infuriated at owners who rented their units outside the rent pool, and Comuzzi proposed the amendment to ban third-party leasing agents. However motivation is not an element of tortious interference or the justification defense. *See Texas Beef,* 921 S.W.2d at 211.

### The Counterclaim

Appellants sued the Partnership to recover the unpaid assessments and accrued interest. They also sought attorney fees and expenses under section 4.02 of the Declaration.

Question 15 asked the jury "What sum of money do you find from a preponderance of the evidence, if paid now in cash, would fairly and reasonably compensate the ... [Council] for all assessments owed to it from ... [the Partnership]?" The jury answered zero.

Peterson's testimony showed Dr. Cantu owed $7,506.68 for unpaid assessments and interest. This amount is not disputed.

Question 16 asked the jury "What sum of money, if paid now in cash, would fairly and reasonably compensate ... [the Council] for all of its litigation expenses, including but not limited to, its attorney's fees, if any, that resulted from the occurrence in question?" The jury answered zero.

The evidence showed that the Council had hired attorneys Richard Stone, Jr., and Ed Barker to handle this case. Stone had practiced law for eleven years and worked in the area of litigation. He was hired to recover the past-due assessments. His hourly fee was $125 per hour. As part of his work in this case he prepared pleadings, performed discovery, researched the issues, and had extensive conferences with his clients. Up to the time of trial he spent fifty-three hours on the case at $125 per hour. His total fee at that point was $6,662.50. Since the time of trial he charged $100 per hour and incurred an additional $6,500 in fees. His total fee was $13,162.50. He was only seeking the fees he incurred to collect the assessments. On cross-examination counsel did not dispute the amount of Stone's attorney fees.

Attorney Ed Barker had practiced law since 1964 and in 1968 began practicing law in Texas. His area of practice was almost entirely civil defense. He defended the Council as well as Peterson and Comuzzi in the Partnership's lawsuit. His defense included preparing for trial, researching the causes of action, and preparing the pleadings and discovery. He charged $90 per hour. His legal fees, including those for trial, totaled $51,406.57. His litigation costs and expenses totaled $5,642. On cross-examination counsel did not dispute the amount of Barker's fee. Counsel asked Barker if he had

segregated his fee, due to the fact he had represented the Council, Comuzzi, and Peterson. Barker did not segregate because he maintained that the Partnership sued Peterson and Comuzzi for actions they took as the Council's agents and employees.

The Council hired attorney Jan Rehler to examine the legal documents relating to Gulf Shores and to render opinions on them. His fee and his partner's fee amounted to "about $16,000."

We conclude the evidence conclusively showed Dr. Cantu, on the Partnership's behalf, owed the Council $7,506.68 in unpaid assessments.

Regarding attorney fees and expenses section 4.02 of the Declaration stated if the Council incurred any legal expenses, including attorney fees and court costs, to enforce any of the Council's rights against a unit owner (including but not limited to collecting delinquent assessments), then the unit owner "shall be liable to the Council for such expenses and the Council may recover the same from such . . . [unit] Owners."

In this case the Council sought to collect unpaid fees which it levied upon Dr. Cantu and the Partnership. The Council also had to defend its rights to levy those fees and prohibit unit owners from using third-party leasing agents. These activities fall within the purview of section 4.02.

Stone and Barker are entitled to recover their attorney fees according to *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880 (Tex.1990) (per curiam) and *Brown v. Bank of Galveston*, 963 S.W.2d 511 (Tex.1998). In the first case Paul Ragsdale sought reelection as a state representative. The Progressive Voters League (PVL) was active in the primary election supporting an opponent. Ragsdale discovered that its campaign treasurer had not been designated as required by the Election Code. Ragsdale filed suit seeking an injunction and damages. The Election Code authorized an award of reasonable attorney fees. Uncontroverted evidence showed Ragsdale's attorney fees for this cause of action totaled $22,500. He was granted injunctive relief, but was denied damages and attorney fees. He appealed, and on remand, the trial court awarded damages of $1 and $150 for attorney fees. He again appealed, and the court of appeals severed the attorney fees portion remanding that issue for a new trial. The supreme court reversed and rendered judgment for Ragsdale awarding him $22,500 as attorney fees. The supreme court stated:

> In order for the court to award an amount of attorneys' fees as a matter of law, the evidence from an interested witness must not be contradicted by any other witness or attendant circumstances and the same must be clear, direct and positive, and free from contradiction, inaccuracies and circumstances tending to case [sic] suspicion thereon. The court, as a trier of fact, may award attorneys' fees as a matter of law in such circumstances, especially when the opposing party has the means and opportunity of disproving the testimony or evidence and fails to do so.

*Ragsdale*, 801 S.W.2d at 882.

In *Bank of Galveston* Vincent Brown sued the Bank, alleging DTPA violations. The Bank counterclaimed for the deficiency on a note and attorney fees. The jury found that the Bank had knowingly violated the DTPA and awarded damages to Brown. The Bank moved for a judgment notwithstanding the verdict, and the trial court granted the motion. On appeal the Bank challenged the trial court's refusal to render judgment on its deficiency counterclaim and its attorney fees claim. The court of appeals held that the trial court erred in refusing to render judgment for the Bank on its deficiency counterclaim and to award attorney fees, and reformed the judgment to do so. The supreme court affirmed the court of appeals' judgment. Regarding the Bank's attorney fees the supreme court held that the court of appeals properly awarded attorney fees because the Bank established the amount. The Bank offered uncontradicted testimony on the amount of its attorney fees. Brown had the means and opportunity of disproving the testimony and failed to do so. *Brown*, 963 S.W.2d at 515 (citing *Ragsdale*, 801 S.W.2d at 882).

In the instant case Stone and Barker offered uncontradicted testimony on the

amount of their attorney fees. The Partnership had the means and opportunity to disprove the testimony but failed to do so. We hold the Council conclusively established the amount of its attorney fees.

We REVERSE the trial court's judgment and RENDER that the Raul S. Cantu No. 3 Family Limited Partnership take nothing by its suit. We RENDER judgment that the Gulf Shores Council of Co–Owners, Inc., recover on its counterclaim from the Raul S. Cantu Family Limited Partnership $7,506.68 for unpaid assessments, $80,569.07 in attorneys fees, and $5,642.00 in litigation expenses.