ACS INVESTORS, INC., f/k/a Affiliated Computer Systems, Inc., Affiliated Computer Services, Inc., f/k/a Affiliated Systems Financial Services, Inc., Transfirst Corporation, Darwin Deason, and J. Livingston Kosberg, Petitioners

v.

Thomas McLAUGHLIN and John Lazovich, Respondents.

No. 96–0100.

Supreme Court of Texas.

Argued Oct. 24, 1996.

Decided Feb. 21, 1997.

Rehearing Overruled May 16, 1997.

TransFirst Corporation, Darwin Deason and J. Livingston Kosberg (collectively "ACS"), for tortious interference with a contract, conspiracy to tortiously interfere with a contract, breach of contract, fraud, and unjust enrichment. The trial court rendered judgment on a jury verdict against each defendant for tortious interference and for conspiracy to interfere with a contract between McLaughlin and First Texas Savings Association (First Texas). The court of appeals affirmed the trial court's judgment. 913 S.W.2d 664.

On appeal, we consider whether McLaughlin can recover from ACS for tortious interference when the contract between McLaughlin and First Texas allowed for the disputed transaction between First Texas and ACS, and whether Kosberg is individually immune from liability as a corporate officer. We conclude that McLaughlin cannot recover from ACS, and that regardless, Kosberg is immune from liability. Therefore, the court of appeals erred when it affirmed the trial court's judgment. Accordingly, we reverse the court of appeals' judgment and render judgment that McLaughlin take nothing from ACS.

## I. BACKGROUND

### A. FACTS

McLaughlin and Lazovich formed Automated Management Services II (AMS II), a partnership, to create and manage Electronic Benefit Transfer (EBT) systems for distributing various government welfare benefits, such as food stamps, unemployment compensation, and social security payments. EBT systems are designed to electronically transfer funds using a debit/credit card at ATM terminals.

### The McLaughlin Agreement

In July 1986, McLaughlin contracted to sell AMS II to First Texas, which owned the MoneyMaker ATM network, for $400,000 cash. The McLaughlin Agreement consists of a letter agreement and a purchase agreement that references and incorporates the letter agreement. After First Texas acquired AMS II, it became the AMS Division

David E. Keltner, Fort Worth, W. Alan Wright, LaDawn H. Conway, A.B. Conant, Raymond P. Harris, Jr., Dallas, for petitioners.

John M. Phalen, Jr., Joseph G. Chumlea, Dallas, for respondents.

Justice BAKER delivered the opinion for a unanimous Court.

Thomas McLaughlin and John Lazovich (collectively "McLaughlin"), sued ACS Investors, Inc., Affiliated Computer Services, Inc.,

of First Texas Government Services (FTGS), a division of MoneyMaker EFT Services (MoneyMaker), which was itself, a division of First Texas. Before signing the McLaughlin Agreement, First Texas appointed McLaughlin director of marketing and product development for MoneyMaker's government and health care division. In the McLaughlin Agreement, First Texas contracted to "commit such levels of financial and administrative support" to the EBT business as First Texas, "in its sole discretion deem[ed] appropriate."

Besides First Texas' $400,000 cash payment for the AMS II partnership, McLaughlin received an option to purchase 49 percent of First Texas' AMS Division for $100,000 at the end of five years. If McLaughlin exercised the purchase option, First Texas contracted to immediately buy back the 49 percent interest for the lesser of a formula price [1] based on FTGS's gross revenues, or for $3 million. The McLaughlin Agreement allowed McLaughlin to exercise the purchase option upon its maturity, but then, only between June 1, 1991 and July 31, 1991.

Paragraph 5 of the McLaughlin Agreement provided First Texas two methods to buy out McLaughlin's limited purchase right early if it chose to do so. First, if First Texas took MoneyMaker or FTGS public, it could buy the unmatured purchase option for $750,000 plus a formula percentage. Second, First Texas could buy out the purchase option for $3 million. Either way, First Texas' early buy-out right ended on June 1, 1989.

Additionally, if First Texas withdrew from the government services business without selling the AMS Division, or if First Texas wanted to accept an outside offer to purchase the AMS Division before May 31, 1991, Paragraph 10 of the McLaughlin Agreement required First Texas to give notice about the sale to allow McLaughlin the opportunity to make an offer to purchase the AMS Division. However, the McLaughlin Agreement did not require First Texas to accept McLaughlin's offer.[2] Finally, the parties could modify or amend the McLaughlin Agreement by written agreement.

### The P & C Agreement

By the end of 1987, First Texas and its subsidiaries were insolvent by more than $463 million. One of First Texas' subsidiaries, First Texas Computer Corporation (FTCC), recorded $12 million in losses. MoneyMaker and the government services division also incurred losses. In July 1988, in an effort to stem its operating losses, First Texas entered a Purchase and Contribution Agreement (the P & C Agreement), consolidating MoneyMaker, the governmental services division, and FTCC into a newly formed First Texas subsidiary, ACS. Before First Texas acquired ACS, Deason owned it. Because of his experience and expertise in the field, First Texas made Deason ACS's Chief Executive Officer.

Before finalizing the P & C Agreement, Deason hired KPMG Peat Marwick to evaluate the ATM network, EBT business, and data processing business. In its report, Peat Marwick identified the McLaughlin Agreement as a "critical issue." In fact, the McLaughlin Agreement was the only item identified in the P & C Agreement's section 10.10, entitled "Conflicts of Purchase Agree-

1. Under the formula, the repurchase price was reached by adding First Texas' gross EBT revenues in fiscal years four and five, multiplying that sum by 3%, subtracting McLaughlin's salary and expenses, multiplying that result by 49%, and then multiplying the final result by 4.4.

2. McLaughlin refers to his rights as a purchase option. However, rather than a purchase option, what the McLaughlin Agreement provided was an unmatured option, more akin to a preemptive right. *See Sinclair Ref. Co. v. Allbritton*, 147 Tex. 468, 218 S.W.2d 185, 188 (1949); *Holland v. Fleming*, 728 S.W.2d 820, 822 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Unlike an option, a preemptive right does not give a party the right to compel an unwilling seller to sell. Instead, once an owner decides to sell, it has an obligation to offer the preemptive right holder an opportunity to buy on the terms offered by a third party. *Holland*, 728 S.W.2d at 822. A further distinction here is that the McLaughlin Agreement did not obligate First Texas to accept an offer from McLaughlin even if it were on the same terms or better than a third party's offer. First Texas could reject an offer from McLaughlin for any reason or no reason at all. Under Paragraph 10(b), First Texas had "no obligation to accept the offer of McLaughlin and Lazovich, regardless of its terms and conditions."

ment with other material agreements of [First Texas] or the Subsidiaries." The same section also listed "the AMS Partners II with respect to government business transfer" as requiring third-party consent and approval. Nevertheless, ACS and First Texas completed the P & C Agreement under a "compressed time frame."

Paragraph 7.1 of the P & C Agreement acknowledged that the McLaughlin Agreement remained with First Texas following the P & C Agreement. It further provided that First Texas would "use its best efforts to cause the McLaughlin Agreement to be terminated without any further obligation or liability among the parties hereto." Additionally, First Texas agreed to indemnify Deason and ACS from any liability related to the McLaughlin Agreement if it could "not be terminated by mutual agreement."

Under the P & C Agreement, First Texas sold all MoneyMaker and its government service division's assets to TransFirst Corporation, another First Texas wholly owned subsidiary. However, First Texas retained the McLaughlin Agreement. Next, First Texas sold all TransFirst and FTCC stock to Gibraltar Savings Association, another one of its wholly owned subsidiaries. Finally, Gibraltar Savings Association transferred all TransFirst and FTCC stock to ACS for 50.01 percent of ACS's common stock and 100 percent of ACS's preferred stock. Kosberg, First Texas' chairman, and several other First Texas officers received ACS stock options.

### The Failed Buy Out

McLaughlin did not learn about the P & C Agreement or its related transactions until after the fact. Nevertheless, McLaughlin continued his work with First Texas in developing the EBT business. Also, McLaughlin and First Texas immediately began negotiations for a buy out of McLaughlin's unmatured purchase option. In December 1988, McLaughlin and First Texas agreed on a $1 million price for a buy out of the purchase option.

Meanwhile, the Federal Home Loan Bank Board (FHLBB) placed First Texas under a supervisory agreement, requiring federal regulator approval of its buy-out agreement with McLaughlin. Before the federal regulator approved the buy-out agreement, FHLBB placed First Texas into receivership. In May 1989, the receiver, Federal Savings & Loan Insurance Corporation (FSLIC), repudiated the McLaughlin Agreement under 12 U.S.C. § 1821(e)(1). Consequently, the entire McLaughlin Agreement, including the $1 million buy-out agreement, became void. McLaughlin did not contest the FSLIC's repudiation. However, in 1990, McLaughlin brought suit against ACS.

### B. The Trial and Appeal

McLaughlin sued ACS, ACSFS, Trans-First, Deason and Kosberg, alleging tortious interference with a contract, conspiracy to tortiously interfere with a contract, breach of contract, fraud, and unjust enrichment. McLaughlin also sued for a declaratory judgment for an equitable lien, arising from the unmatured purchase option, on ACS. The trial court granted ACS's motion for summary judgment against McLaughlin's contract, fraud, unjust enrichment and declaratory judgment actions. The parties tried the tortious interference claims to a jury.

The jury found that each defendant had interfered with and engaged in conspiracy to interfere with the McLaughlin Agreement. The trial court rendered judgment on the jury's verdict awarding McLaughlin $3 million in actual damages, $1.5 million in exemplary damages, and prejudgment interest of about $1.5 million. The court of appeals affirmed the trial court's judgment.[3]

### II. INTERFERENCE WITH THE McLAUGHLIN AGREEMENT

The court of appeals held that ACS tortiously interfered with the McLaughlin Agreement by purchasing the AMS Division from First Texas. ACS argues that First Texas did not sell the AMS Division, but only transferred the asset into a subsidiary through the P & C Agreement. Whether a

---

**3.** Justice Devany dissented. 913 S.W.2d at 681.

sale or a transfer, the P & C Agreement had the effect of severing the purchase option from the asset. This severance is the essence of McLaughlin's tortious interference claim. ACS contends that the court of appeals erred by affirming the trial court's judgment that it tortiously interfered with the McLaughlin Agreement. The court of appeals held that because ACS knew about the McLaughlin Agreement and considered it a potential conflict for its acquisition, there was evidence of tortious interference. ACS argues that no evidence exists to support the jury's findings because, at most, ACS merely persuaded First Texas to do what it had a right to do under the McLaughlin Agreement. Neither party contends that the McLaughlin Agreement is ambiguous.

## A. Applicable Law

### 1. Standard of Review

In deciding a no evidence claim, we consider the evidence and inferences tending to support the jury's findings. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). We disregard all contrary evidence and inferences. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 275–76 (Tex.1995); *Havner*, 825 S.W.2d at 458. Any evidence of probative force supporting a finding requires us to uphold the jury's verdict. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989).

### 2. Tortious Interference

A party alleging tortious interference must prove four elements to sustain its claim: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. *See Juliette Fowler Homes v. Welch Assocs.*, 793 S.W.2d 660, 665 (Tex. 1990); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex.App.—Eastland 1992, writ denied).

When a dispute arises from the terms of a contract, and the contract is not ambiguous, we can determine the parties' rights and obligations under the agreement as a matter of law. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996); *Westwind Exploration, Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 381 (Tex.1985). Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference. *See C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir.), *cert. denied*, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985); *West Texas Gas, Inc. v. 297 Gas Co.*, 864 S.W.2d 681, 686 (Tex.App.—Amarillo 1993, no writ)(citing *Kingsbery v. Phillips Petroleum Co.*, 315 S.W.2d 561, 576 (Tex.Civ.App.— Austin 1958, writ ref'd n.r.e.)); *but cf. Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989). Moreover, a contracting party's preemptive rights are not triggered by the other contracting party's negotiations with a third party purchaser. *See Tenneco Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 645 (Tex.1996).

## B. Application of Law to Facts

The court of appeals construed the McLaughlin Agreement's purchase option provision as an obligation for First Texas to actually transfer 49 percent of the AMS Division to McLaughlin upon exercise of the purchase option in 1991. The court of appeals reasoned that, when First Texas sold the AMS Division to ACS, the sale severed First Texas' obligation to transfer a 49 percent interest in the AMS division from the property—the AMS division. This, according to the court of appeals, abrogated McLaughlin's future purchase option rights. The court of appeals concluded that because the sale eliminated the possibility that First Texas could honor the 1991 purchase option in 1991, First Texas breached the McLaughlin Agreement. Thus, ACS, as a purchaser with notice of the McLaughlin Agreement, tortiously interfered with McLaughlin's contract rights by inducing First Texas' breach.

Based on the record and the legal conclusions it made about the nature of the McLaughlin Agreement and the disputed sale to ACS, the court of appeals affirmed the trial court's judgment. We conclude that the court of appeals erred because it did not

properly analyze the parties' rights under the McLaughlin Agreement.

The evidence shows that ACS merely negotiated for First Texas to do what it had a right to do under the McLaughlin Agreement. Paragraph 10(b) of the McLaughlin Agreement provides for the sale of the AMS Division to an outside buyer, like ACS, despite McLaughlin's 1991 purchase option. Moreover, Paragraph 10(b) does not require a purchaser to assume the unmatured purchase option obligation. Under the McLaughlin Agreement, McLaughlin contracted for the possibility that the unmatured purchase option could be severed from the asset. Consequently, the severance here cannot be a breach of contract, and ACS cannot be held liable for inducing First Texas to do what it had a right to do under the McLaughlin Agreement. *See Control Data Corp.,* 759 F.2d at 1248.

 McLaughlin argues that ACS's argument is a belated attempt to invoke the privilege of legal justification or excuse as an affirmative defense to liability. However, this is not a legal justification or excuse case. That situation exists when the party asserting the privilege does not deny the alleged interference, but instead seeks to avoid liability upon a claimed interest that is being impaired or destroyed by the plaintiff's contract. *See Sterner,* 767 S.W.2d at 689–90. A party must plead and prove the affirmative defense of legal justification or excuse. *Sterner,* 767 S.W.2d at 690. However, in this case, legal justification or excuse is not an issue. The focus in evaluating a tortious interference claim begins, and in this case remains, on whether the contract is subject to the alleged interference. *See Juliette Fowler Homes,* 793 S.W.2d at 664. Here, the evidence and the McLaughlin Agreement's express terms reveal that the McLaughlin Agreement is not subject to McLaughlin's tortious interference allegations. *See Westwind Exploration, Inc.,* 696 S.W.2d at 381. Instead, Paragraph 10(b) allows for an outside buyer like ACS to contract to purchase the AMS Division despite McLaughlin's limited purchase rights. Under a proper construction of the McLaughlin Agreement, ACS did not interfere as a matter of law. *See Westwind Exploration, Inc.,* 696 S.W.2d at 381. Therefore, it need not prove legal justification or excuse to avoid liability.

The court of appeals also held that First Texas could have avoided a breach by refusing to sell the AMS Division to a third party without first buying out the unmatured purchase option under Paragraph 5 of the McLaughlin Agreement. However, the McLaughlin Agreement did not require First Texas to make an early buy out of the purchase option. Under Paragraph 5, First Texas could make an early buy out if it "desire[d] to purchase the Option." In fact, under Paragraph 5, First Texas' early buy-out right expired on June 1, 1989. At the same time, under Paragraph 10(b), First Texas retained the right to sell the AMS Division to a third party until May 30, 1991. Accordingly, First Texas could have made an early buy out, as it tried to do in December 1988 before the FSLIC's repudiation, but nothing in the McLaughlin Agreement obligated it to do so.

McLaughlin's rights did not include an early buy out if First Texas decided to sell the AMS Division. Instead, the McLaughlin Agreement's terms unambiguously contemplate a transaction where the unmatured purchase option could be abrogated through severance of the asset and the purchase option obligation, leaving McLaughlin with nothing other than the initial $400,000 proceeds for the AMS II partnership and a right to bid on the AMS Division.

The evidence reveals that McLaughlin might have a legitimate complaint about First Texas' failure to provide notice of the proposed sale to ACS as Paragraph 10(b) required. However, there is no evidence that by negotiating the P & C Agreement, ACS prevented First Texas from performing its obligation to provide McLaughlin notice and an opportunity to bid. *See Tenneco Inc.,* 925 S.W.2d at 645. Therefore, the court of appeals erred in holding that there was legally sufficient evidence to support the jury's tortious interference findings.

## III. KOSBERG'S INDIVIDUAL LIABILITY

Because there is no probative evidence to support McLaughlin's tortious interference claim, none of the Petitioners have any liability. Nevertheless, we answer the court of appeals' holding that Kosberg could be held individually liable.

### A. APPLICABLE LAW

#### 1. Standard of Review

Again, we consider the evidence and inferences tending to support the jury's findings against Kosberg. *Havner*, 825 S.W.2d at 458. Any probative evidence supporting the jury's findings against Kosberg requires us to uphold the verdict against him. *Southern States Transp.*, 774 S.W.2d at 640.

#### 2. Officer's Liability for Tortious Interference

■ Generally, a corporate officer's acts on the corporation's behalf are deemed corporate acts. *See Leitch v. Hornsby*, 935 S.W.2d 114, 117–18 (Tex.1996); *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.1995). A corporate officer or director may not be held liable for inducing the corporation to violate a contractual obligation as long as he or she acts in good faith on the corporation's behalf. *See Holloway*, 898 S.W.2d at 795. A corporate officer's potential personal gain is not determinative. *Holloway*, 898 S.W.2d at 796. A corporate officer's mixed motives—to benefit himself and for the corporation to benefit—are insufficient to establish liability. *Holloway*, 898 S.W.2d at 796; RESTATEMENT (SECOND) OF TORTS § 772 cmt. c. (1979)(it is immaterial that the corporate agent also profits). Instead, the plaintiff must show that the officer acted in a manner so contrary to the corporation's best interests that his or her actions could only have been motivated by personal interest. *Holloway*, 898 S.W.2d at 796.

### B. APPLICATION OF LAW TO FACTS

■ The court of appeals held that although the P & C Agreement might have been a reasonable transaction for a solvent financial institution, it was not in the best interest of an insolvent institution like First Texas. Accordingly, the court of appeals found legally sufficient evidence to support the trial court's judgment against Kosberg. We conclude that the court of appeals improperly substituted its business judgment for that of First Texas' board of directors, and that there is no evidence to support individual liability against Kosberg.

The record reveals that under the P & C Agreement, First Texas received ACS stock in return for all TransFirst and FTCC stock, which by then, included the AMS Division's assets. When First Texas entered into the P & C Agreement, it was insolvent. Despite First Texas' insolvency, the P & C agreement provided for the transfer of $75.3 million of its assets and cash to ACS, and a partial up-front payment to ACS on a 10–year data processing contract. McLaughlin asserts that First Texas paid more than the value it received when receivership was likely. The evidence also reveals that the P & C Agreement provided Kosberg, First Texas' board chairman, an option to buy a 49.9% interest in ACS.[4]

Kosberg approved the P & C agreement along with the board's seven other members. Given the board's unanimous support for the P & C agreement, we cannot conclude that Kosberg was motivated purely by his own personal interests or that he acted contrary to First Texas' best interests despite First Texas' financial troubles and his receipt of ACS stock options.

On this record, we conclude that there is no probative evidence that the terms of the P & C Agreement were so contrary to First Texas' interests that Kosberg's personal interests were the only motivation for the agreement. *See Holloway*, 898 S.W.2d at 796.

4. The P & C Agreement provided stock options for twenty-six First Texas employees, including Kosberg. Kosberg's stock options were vested, unlike some of the others, because he was to serve on ACS's board, without pay and without director's liability insurance.

## IV. CONCLUSION

We conclude ACS merely negotiated for First Texas to do what it had a right to do under the McLaughlin Agreement. We also conclude that there is no evidence that Kosberg did not act in good faith or that his actions were motivated solely by personal interest. Accordingly, we hold that the court of appeals erred when it affirmed the trial court's judgment. Therefore, we reverse the court of appeals' judgment. We render judgment that Thomas McLaughlin and John Lazovich take nothing from ACS Investors, Inc., Affiliated Computer Services, Inc., TransFirst Corporation, Darwin Deason and J. Livingston Kosberg.