Allan R. KING, Donald E. Holley, and F. Edward Barker, Appellants,

v.

Philip E. GRAHAM and Thomas Michael Wren, Appellees and Cross–Appellants,

v.

J. Bonner Dorsey and Hugo Berlanga, Cross–Appellees.

No. 04–98–00464–CV.

Court of Appeals of Texas, San Antonio.

Feb. 14, 2001.

Deborah R. Sundermann, Corpus Christi, Jeffrey D. Small, San Antonio, for Appellant.

Douglas E. Mann, Peeler, Cartwright & Mann, P.C., Jo Ellen Hewins, Canales & Simonson, P.C., Corpus Christi, Darby Riley, Law Office of Darby Riley, San Antonio, J. Bonner Dorsey, Corpus Christi, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH DUNCAN, Justice, and KAREN ANGELINI, Justice.

## OPINION

TOM RICKHOFF, Justice.

We grant the appellees and cross-appellants' motion for rehearing en banc. Our opinion and judgment of January 12, 2000 on appellants' motion for rehearing is withdrawn, and the following opinion and judgment are substituted.

## NATURE OF THE CASE .

Allan R. King, Donald E. Holley, and F. Edward Barker appeal from a jury verdict rendered in favor of Phillip E. Graham and Thomas Michael Wren. On appeal, King, Holley and Barker argue that the evidence is legally and factually insufficient to support the jury's findings of malicious prosecution and damages and assert that Graham and Wren did not establish any basis for individual liability. On cross-appeal, Graham and Wren allege the trial court erred in granting directed verdicts in favor of J. Bonner Dorsey and Hugo Berlanga.

## FACTUAL BACKGROUND

Holley, Barker, Dorsey, and Berlanga had served as directors of a corporation known as Sarita Safaris. Sarita Safaris booked hunters to hunt on land leased from the Kenedy Ranch. Sarita Safaris lost its hunting lease after the Kenedy ranch decided to pursue other uses of the land. Because the hunting lease was lost, Sarita Safaris dissolved and King, Holley, Barker, and Dorsey decided to form Safari Specialties, Inc. ("SSI"). SSI, based in Corpus Christi, was established to book hunters for "full-service" hunting trips complete with hunting guides and nice accommodations.

Although the shareholders only had experience booking hunts in South Texas, the shareholders decided to book hunting trips for whitetail deer and exotic animals in the Hill Country. SSI contacted Graham and Wren, who lived in Kerrville, about the possibility of becoming hunting guides for SSI in the Hill Country. According to Graham's testimony, Holley indicated that 50 whitetail deer and 400 exotic animals would be needed to accommodate hunters booked by SSI. In May 1991, King and Holley met Graham and Wren in Kerrville to discuss the plan and to visit some of the ranches that might be used for the hunting trips. Graham and Wren accompanied King and Holley to the Colbath Ranch. Graham and Wren talked to Mr. Colbath about reserving twenty whitetail deer. Graham testified that a deal was made with Mr. Colbath and that he and Wren were responsible for twenty deer at $850 a piece. Graham also testified that a deposit of $15,000 for guiding services was discussed, but King and Holley testified that there was no discussion concerning a $15,000 deposit for guiding services.

After returning to Corpus Christi, Holley sent a letter agreement on behalf of SSI to Graham and Wren. According to the letter agreement, the guides would be responsible for all fees and expenses associated with guiding and the costs of animals. The letter agreement further stated

that the guides would receive fifty percent of their payment for guiding services fourteen days before the hunt with the remainder being paid after the hunt. The letter agreement also stated that twenty-eight whitetail deer had been secured and requested Graham and Wren to use their best efforts to secure twenty-two additional whitetail deer. Graham and Wren signed the letter agreement and a pricing sheet which showed the allocation of hunting fees between SSI and Graham and Wren.

After executing the letter agreement, Graham discussed the $15,000 deposit with Holley. Holley told Graham that he needed an invoice to show the purpose of the funds. According to Graham, Holley told him that SSI had only $12,050 in the bank and therefore could not provide a $15,000 deposit. On June 12, 1991, SSI wired $12,050 to Graham's account at the Bank of Kerrville. The invoice contained Graham's address and signature and reflected the following:

ROCKY CREST RANCH:

| | |
|---|---|
| 7 Axis Bucks 30″ or better @ $900 . . . . . . . . | $ 6300.00 |
| 8 Black Buck (18″ or up) @ $700 . . . . . . . . . | $ 5600.00 |
| | $11900.00 |
| | |
| 20 White Tail Deer (Colbath) No Deposit | –0– |
| 8 White Tail Deer (Ponderosa) @ 400 . . . . . | $ 3200.00 |
| | |
| TOTAL . . . . . . . | $15,100.00 |

ADVANCE DEPOSIT ON ABOVE = $ 12,050.00

Wire Instructions:

For Credit to: BANK OF KERRVILLE
ABA 114–907798

For further Credit
to Account # 0–767–089–6

In July, Wren talked to King about an additional $7500 needed immediately to secure 25 whitetail deer on the Scheffield Ranch. Because only Holley had authority to sign checks on behalf of SSI and he was out of town, King sent Wren a check written from Barker and King's law firm account by overnight mail. SSI later reimbursed the law firm.

The central issue in this case involves the application of these deposits. King, Barker, and Holley testified that it was their understanding that the money was to be paid to the ranchers to reserve the types of animals reflected on the invoice. Graham and Wren testified that the money was paid to them because they had reserved animals and were accountable to the ranchers for the cost of the animals regardless of whether SSI booked hunters. According to Graham and Wren, the deposit was discussed when the men met in Kerrville and it was customary in the hunting business to give the guide a deposit. Graham and Wren testified that if SSI had booked hunts, the amount of the deposits would have been subtracted from their guiding fees. Graham and Wren testified that they paid $2500 to the Scheffield Ranch but that they paid no funds to any of the other ranches.

As the summer progressed, SSI had booked no exotic or whitetail deer hunts.

According to the testimony, exotic animals can be hunted throughout the year whereas whitetail deer can only be hunted during deer season, which begins sometime in November. Having expected exotic game hunters during the summer months, Graham and Wren made numerous phone calls to SSI to find out if any hunts were being booked. SSI's part-time secretary, Patty Coplin, testified that she faxed Graham and Wren names of hunters who had booked hunts through Sarita Safaris. Although Graham and Wren testified that SSI was responsible for booking the hunts, Wren nevertheless made numerous phone calls to the people on SSI's list in an attempt to secure hunters for the animals that had been reserved. Wren testified that the people he called were not interested in hunting in the Hill Country and that the hunts were overpriced.

As deer season neared, Graham and Wren came to the conclusion that SSI was not going to book any hunters. According to King, he contacted Graham the day before deer season to tell him that a hunter had been booked. Graham told King to contact Wren but Wren was not available when King called because he was hunting, so King left a message with Wren's wife. Wren never returned King's call. King then contacted some of the ranchers whom King believed had been paid deposits by Graham and Wren. Jack Burch of the Ponderosa Ranch told King that no deer had been reserved in SSI's name. Burch recalled talking to Wren during the summer and that Wren told him that the company that he was working for had backed out of the deal but that he had plenty of hunters to hunt the eight reserved deer. Holley called one of the other ranches where animals had been reserved and was told that no animals had been reserved for SSI.

Because the money paid to Graham and Wren had not been paid to ranches as deposits for animals, King reported the matter to the Kerr County Sheriff's Department on November 1, 1991. The Sheriff's Department asked King to explain the situation in writing and King sent a letter dated November 6. In the letter, King alleged that Graham and Wren committed theft and fraud because no animals had been reserved on behalf of SSI at the ranches named in the invoice. The letter listed the shareholders of SSI as Holley, Barker, Dorsey, Berlanga, and King. As a result of the complaint, Brad Alford, a Kerr County deputy sheriff, began a theft investigation.

After investigating the complaint, Alford and his supervisor decided that they had enough evidence to send the case to the District Attorney. The District Attorney, Ronald Sutton, decided that the case was ready for presentment to the grand jury. After presentment in January of 1992, the grand jury indicted Graham and Wren for felony theft. Subsequent to the indictment, Sutton filed a motion to dismiss the indictment. Sutton testified that he dismissed the indictment because the letter agreement between SSI and Graham and Wren was effective until February 1, 1992, which was after the date of the indictment. Thus, Sutton believed there could be no theft because Graham and Wren still had time to perform under the terms of the letter agreement. Graham and Wren were never re-indicted.

Because of King's letter to the Kerr County Sheriff's Department, Graham and Wren filed suit against King, Holley, Barker, Dorsey, and Berlanga alleging malicious prosecution. The court granted a directed verdict on behalf of Dorsey and Berlanga. After deliberations, the jury found that King, Barker, and Holley had maliciously prosecuted Graham and Wren.

Having found malicious prosecution, the jury awarded mental anguish damages in the amount of $150,000 for Wren and $50,000 for Graham. The jury also awarded damages for injury to business and social reputation and standing in the amount of $100,000 for both Wren and Graham. In addition to mental anguish and injury to reputation damages, the jury also awarded Graham and Wren $3250 each for attorney's fees and bond fees incurred in defending the criminal charges.

## STANDARD OF REVIEW

On appeal, King, Holley, and Barker challenge the legal and factual sufficiency of the jury's verdict as to liability and damages. To determine whether there is legally sufficient evidence, all the record evidence and inferences must be viewed in a light most favorable to the finding. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.* In reviewing factual sufficiency issues, the reviewing court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Under this analysis, we do not pass upon the credibility of the witnesses, nor do we substitute our judgment for that of the fact finder, even if there is conflicting evidence upon which a different conclusion could be supported. *See Thrift v. Hubbard,* 974 S.W.2d 70, 77 (Tex.App.—San Antonio 1998, pet. denied).

## MALICIOUS PROSECUTION

In the first issue on appeal, King, Holley, and Barker allege that the evidence was legally and factually insufficient to support the jury's finding of malicious prosecution. The following elements must be established in a malicious prosecution action: (1) a criminal prosecution was commenced against the plaintiff; (2) the prosecution was initiated or procured by the defendant; (3) the prosecution terminated in favor of the plaintiff; (4) the plaintiff was innocent; (5) the defendant lacked probable cause to instigate the prosecution; (6) the defendant acted with malice in bringing about the prosecution; and (7) the plaintiff suffered damages as a result of the prosecution. *Id.; Zess v. Funke,* 956 S.W.2d 92, 93 (Tex.App.—San Antonio 1997, no writ). In malicious prosecution actions, the court must strike a balance between society's interest in the good faith reporting of crimes and the interest of individuals in being protected from wrongful prosecution. *Browning-Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 290–91 (Tex. 1994); *Thrift,* 974 S.W.2d at 77. To protect this balance, the court must require strict proof of each element of the cause of action. *Lieck,* 881 S.W.2d at 291; *Thrift,* 974 S.W.2d at 77. If the elements of malicious prosecution are proven, however, liability is established. *Id.*

It is undisputed that a criminal prosecution was commenced against Graham and Wren that ultimately terminated in their favor. The appellants, however, contest the proof of the remaining required elements of malicious prosecution.

### A. Procurement

In order to prove malicious prosecution, the plaintiff must establish that the prosecution was initiated or procured by the defendant. A person initiates a criminal prosecution if he makes a formal charge to law enforcement. *Lieck,* 881 S.W.2d at 292; *Thrift,* 974 S.W.2d at 77. A person procures a criminal prosecution

if his actions are enough to cause the prosecution and, but for his actions, the prosecution would not have occurred. *Id.* A person does not procure a prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement officer or the grand jury, unless the person provides information that he knows is false. *Id.*

King's actions of calling the Kerrville County Sheriff's Department and sending the November 6, 1991 letter were enough to cause the prosecution. However, the decision whether to prosecute was left up to the discretion of the Sheriff's Department, the District Attorney, and the grand jury. Because the decision to prosecute was left up to the discretion of others, King could have procured the prosecution only if he provided information to the Sheriff's Department that he knew was false.

Graham and Wren argue that King's complaint letter contained false statements such as the assertion that several hunters were booked to hunt by SSI during the final week of October. Coplin, SSI's secretary, testified that she did not know of any hunts that had been booked through SSI. King testified that, although he did not know the identity of the hunters, Holley told him several hunters were booked during the final week of October. Holley testified that it had been six years and he did not know the identity of the hunters who were booked during the final week in October but that SSI was not able to complete the booking process because SSI was unable to contact Graham and Wren. On the next day of trial, Holley testified that he had looked over the list of names and remembered one hunter, Mr. Anderson. According to Holley, Mr. Anderson and his group of hunters were booked the last week in October but he did not know the location of the paperwork documenting the

hunt. This evidence is legally and factually sufficient to support a jury finding that the statement made in the letter that hunters had been booked was false.

■■■ Along with the statement that hunts had been booked, Graham and Wren also allege that King's statement that Graham and Wren had not reserved any animals was false. Graham and Wren testified that they had reserved 53 whitetail deer. Having made agreements with the ranchers to reserve the whitetail deer, Graham and Wren testified that they were responsible for the price of the reserved deer, and therefore, required a deposit for guiding services. King and Holley testified they checked with ranchers who they believed had been given money to reserve deer, but found out that no deer had been reserved for SSI. Having checked with the ranchers, King made the statement that no hunts had been reserved. Graham and Wren, however, testified that they had reserved the deer personally and, therefore, the hunts were not in the name of SSI. Although conflicting evidence exists as to the falsity of the statement, the jury must have believed the testimony of Graham and Wren concerning the deposit and reservation of deer, and we do not substitute our judgment for that of the fact finder, even if there is conflicting evidence upon which a different conclusion could be supported. *See Thrift,* 974 S.W.2d at 77.

■■■ Graham and Wren further complain about the omission of material information that in their opinion would have given a more accurate portrayal of the relationship between them and SSI. The Texas Supreme Court has held that failing to fully and fairly disclose all material information and knowingly providing false information are relevant to the causation element of malicious prosecution. *See Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 519 (Tex.1997). Along with

the alleged false statements, Graham and Wren contend that the failure to disclose the existence of 99 phone calls Graham and Wren made to SSI contributed to the false statements. Graham and Wren also complain of: (1) omission of price sheets attached to the letter agreement; (2) inclusion of Berlanga's name as a SSI shareholder; and (3) use of the corporate name of SSI that had not been successfully filed with the Secretary of State.

The jury could have reasonably concluded that the failure to disclose the 99 phone calls contributed to the prosecution. The letter implies that Graham and Wren took the money and ran, never to be heard from again. Evidence that Graham and Wren made numerous phone calls to SSI decreases the likelihood that they intended to defraud SSI. Because the evidence proved that Berlanga was never a shareholder in SSI, the jury could have reasonably concluded that the inclusion of Berlanga, who was a State Representative, served as an attempt to give the complaint more credibility.

King, Holley, and Barker argue that any inaccuracies in King's letter were patently immaterial and had no effect on the decision to prosecute. Alford and Sutton testified that omission of the price sheet and the use of Berlanga's name played no part in the decision to investigate. With regard to the statement that hunts had been booked, Sutton testified that the issue was whether money was taken for a particular purpose and not applied to that purpose, not whether any hunters had been booked. Although Sutton and Alford testified that any alleged false statements and omissions had no effect on the investigation, the jury was free to draw its own conclusions as to the falsity of the statements.

Further, the defendants argue that the court erred in submitting the definition of procurement without informing

the jury that false information must be material. In *Lieck*, the Supreme Court found that procurement should be defined in the jury charge as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*See Lieck*, 881 S.W.2d at 293. Because the jury charge mirrors the language in *Lieck*, which does not require false information to be material, the court did not err in its submission of the definition of procurement.

Holley and Barker contend that they did not procure the prosecution because King wrote the complaint letter. A prosecution, however, can be procured by more than one person. *Id.* King testified that he conferred with Holley before contacting the Sheriff's Department and, in fact, included information obtained from Holley in the letter. As far as Barker's involvement, King testified that Barker knew about the conversation with the Kerr County Sheriff's Department. Although Barker was unsure whether he saw the letter before it was mailed, he absolutely approved of the letter and thought it was a fair rendition of the facts.

Viewing the evidence in the light most favorable to the verdict, we find that legally sufficient evidence exists to establish the element of procurement. After reviewing all of the evidence, the jury's finding of procurement was not so against the great

weight and preponderance of the evidence as to be manifestly unjust.

## B. Probable Cause

 King, Holley, and Barker allege that the evidence is legally and factually insufficient to support the finding that they lacked probable cause to instigate the prosecution of Graham and Wren. Probable cause is the "existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor [complainant], that the person charged was guilty of the crime for which he was prosecuted." *Richey*, 952 S.W.2d at 517 (citing *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983)). In determining whether probable cause exists, the trier of fact must determine "whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Id.; see Thrift*, 974 S.W.2d at 79. Thus, the focus should be on the actions of the complainant and his perspective of the facts at the time the report was made, and not on the subsequent actions of others or information discovered after the report. *See Thrift*, 974 S.W.2d at 79 (citing *Akin*, 661 S.W.2d at 921).

 An initial presumption exists in malicious prosecution cases that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings. *Richey*, 952 S.W.2d at 517. This presumption is rebutted, however, when the plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause. *Id.* at 518. The burden then shifts to the defendant to offer proof of probable cause. *Id.* When the facts underlying the defendant's decision to prosecute are disputed, the tri-

er of fact must weigh evidence and resolve conflicts to determine whether probable cause exists, as a mixed question of law and fact. *Id.*

 Because the facts underlying the decision to prosecute are disputed, the jury must weigh the evidence and resolve the conflicts. Although we begin with the presumption that the defendant acted with probable cause, Graham and Wren offered evidence that the defendant's version of the facts was inaccurate. Graham and Wren testified that they discussed the advance deposits with King and Holley when the men met in Kerrville and all parties understood that the deposits were for Graham and Wren. According to Graham, he prepared the invoice because Holley said he needed a record of the reserved animals. Although King, Holley, and Barker contend that the deposit was intended to be paid to ranchers to reserve animals, the jury apparently believed Graham and Wren. Based on the evidence that Graham and Wren made numerous phone calls to SSI and on Coplin's testimony that Graham and Wren maintained contact with SSI and made attempts to contact the hunters on SSI's lists, the jury could have found that it was not reasonable for King, Barker, and Holley to believe that Graham and Wren had committed theft. Further, Holley had no phone records to substantiate his claim that he tried to contact Graham and Wren numerous times in September. In all likelihood, the jury felt that King acted too hastily in reporting his suspicions to the Kerr County Sheriff's Department. It is also possible that the jury believed that SSI had not held up their end of the bargain because they failed to book any hunters for the Hill Country. Graham and Wren argue that, because SSI had no civil recourse for recovery of the money, SSI filed a criminal

complaint in order to get their money back through restitution.

Viewing the evidence in the light most favorable to the verdict, more than a scintilla of evidence exists to support the jury's finding of lack of probable cause. Although conflicting evidence exists upon which a different conclusion could be supported, we cannot substitute our judgment for that of the fact-finder. Therefore, the jury's finding of lack of probable cause was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## C. Malice

 King, Holley, and Barker argue that the evidence is legally and factually insufficient to support the finding ·of malice. Malice may be established by direct or circumstantial evidence and may be inferred from lack of probable cause. *Thrift*, 974 S.W.2d at 80. Malice is defined as ill will, evil motive, gross indifference, or reckless disregard of the rights of others. *Id.*

Having found a lack of probable cause, malice may be inferred. Because the defendants never demanded a refund of the money before contacting the Sheriff's Department, sufficient evidence exists from which the jury could have found that SSI acted with reckless disregard for the rights of Graham and Wren. Further, Graham and Wren introduced evidence of over 99 phone calls made to SSI that shows Graham and Wren were trying to make the agreement work. Evidence exists from which a jury could find that SSI failed to hold up its end of the bargain and hastily reported the alleged theft without really trying to work out the problem with Graham and Wren.

Viewing the evidence in the light most favorable to the verdict, we find the evidence legally sufficient to support the jury's finding of malice. Although the jury could have also concluded that the appellants did not act with malice, we do not substitute our judgment for that of the fact-finder. Accordingly, we find that the malice finding was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

## D. Innocence

 King, Holley, and Barker argue that Graham and Wren were not innocent of the theft charges. Graham and Wren testified that the deposits were for their services and not for the ranchers. The trier of fact believed their testimony and, therefore, believed that they were innocent of the theft charges. Thus, legally sufficient evidence exists to support the jury's finding of innocence. Having reviewed all of the evidence, the jury's finding of innocence was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Having found legally and factually sufficient evidence of the elements of malicious prosecution, we overrule the first issue.

## DAMAGES

King, Holley, and Barker allege that the evidence was legally and factually insufficient to support the award of damages for mental anguish and injury to business and social reputation and standing. The jury awarded mental anguish damages in the amount of $150,000 for Wren and $50,000 for Graham. The jury also awarded damages for injury to business and social reputation and standing in the amount of $100,000 for both Wren and Graham. The defendants argue that the evidence does not show that any mental anguish rises to a compensable level and that Graham and Wren failed to show any harm to business or social reputation.

## A. Mental Anguish

An award of mental anguish damages must be supported by direct evidence of the nature, duration, and severity of the mental anguish, thereby establishing a substantial disruption in the daily routine. *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). When the plaintiff fails to present direct evidence of the nature, duration, or severity of the anguish, we apply traditional no evidence standards to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Id.* (quoting *J.B. Custom Design & Bldg. v. Clawson,* 794 S.W.2d 38, 43 (Tex.App.—Houston [1st Dist.] 1990, no writ)). Mental anguish has also been defined as including "a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Id.* (citing *Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ)). The indictments made the front page of the *Kerrville Mountain Sun* with the headline, "Locals scam legal eagles from Corpus." The article identified Graham and Wren and gave a short rendition of the allegations. Wren testified that the ordeal made him mad because he had not done anything wrong but that people were talking about him all over town. Wren felt like he had been convicted and had to prove his innocence to people. Wren testified that he thought about the indictment every day. Wren's wife testified that the indictment caused humiliation, embarrassment, and emotional distress to the whole family. According to Wren's wife, Wren had many nights that he did not sleep and he was always on edge about the indictment.

Graham testified that the incident caused him humiliation and embarrassment although when asked about emotional distress, Graham did not know what that was. Graham's wife testified that Graham was very embarrassed and upset about the indictment. According to Graham's wife, she became upset with him because she could not understand how he got into such a mess, which put a strain on their marriage. Graham's wife testified that she thought the indictment contributed to Graham's high blood pressure problems, but admitted that she did not know whether Graham had high blood pressure before the indictment because he had not been checked before the indictment. According to Graham's wife, Graham's daughter suffered embarrassment at school, which upset Graham. The testimony of Graham and Wren and their wives demonstrated the nature, duration, and severity of the mental anguish suffered as a result of the indictment for felony theft. Therefore, the evidence was legally and factually sufficient to support the jury's award of damages for mental anguish.

## B. Injury to Reputation

In addition to awarding damages for mental anguish, the jury also awarded damages for injury to business and social reputation. Because Wren made his living as a hunting guide, the allegations went directly to his business reputation. According to Wren, some ranchers became skeptical of him while others asked for an explanation. Although Graham no longer works in the hunting business, he testified that the felony indictment hinders his ability to be awarded government contracts. Before the indictment, Graham had been a general contractor but must now be a subcontractor because he cannot meet the bonding requirements for a contractor as a result of his indictment. Graham also tes-

tified that he was unable to obtain a Small Business Administration loan while he was under indictment. Holley and Barker argue that no evidence was presented of any government contract upon which Graham made a bid and was rejected or the amount of any loan. The defendants also allege that the damages are speculative.

Because Graham and Wren are burdened socially and professionally with the gross social stigma of an indictment for theft, the jury reasonably concluded that Graham and Wren suffered damage to business and social reputation in the amount of $100,000. Thus, we find legally and factually sufficient evidence to support the jury's award of damages. We overrule the second issue.

### INDIVIDUAL LIABILITY

 The defendants argue that they are not individually liable because the letter was written on behalf of SSI and later ratified by the shareholders of SSI. Because SSI was unsuccessful in amending its name with the Secretary of State, Graham and Wren argue that SSI was not a qualified Texas corporation and, therefore, the defendants should be held liable as joint tortfeasors doing business as SSI.[1] Appellants contend that a failed name change does not alter the corporate status of Sarita Safaris. *See* TEX. BUS. CORP. ACT. ANN. art. 4.06, § B (Vernon 1980).[2]

 Alternatively, Graham and Wren argue that a corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third

persons even though he performed the acts as an agent of the corporation. *See Kinkler v. Jurica,* 84 Tex. 116, 19 S.W. 359 (1892); *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 221 (Tex.App.—Waco 1993, writ denied) (holding corporate agent liable for knowing participation in misappropriation); *Commercial Escrow Co. v. Rockport Rebel, Inc.,* 778 S.W.2d 532, 541 (Tex.App.—Corpus Christi 1989, writ denied) (holding corporate agent liable for knowing DTPA violations); *Grierson v. Parker Energy Partners,* 737 S.W.2d 375, 377–78 (Tex.App.—Houston [14th Dist.] 1987, no writ) (holding corporate agent can be held personally liable if agent knowingly breached fiduciary duty); *Barclay v. Johnson,* 686 S.W.2d 334, 336–37 (Tex. App.—Houston [1st Dist.] 1985, no writ) (holding corporate agent personally liable for false representations). If the corporate agent knowingly participates in the tortious act, the corporate veil need not be pierced to impose individual liability. *Id.*

In response, the appellants argue that recent Supreme Court cases impliedly overrule cases cited by Graham and Wren. In *Leitch v. Hornsby,* the Texas Supreme Court found that an officer was not liable for negligence unless he owed an independent duty of reasonable care to the injured party apart from his employer's duty. *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996). *Leitch,* however, was a negligence case and, therefore, its language does not apply to intentional torts. The defendants also point to another recent Supreme Court case. *See ACS Investors,*

---

1. Barker filed an amendment to the articles of incorporation of Sarita Safaris, Inc. with the Secretary of State changing the name of the corporation to Safari Specialties, Inc. However, the signature line mistakenly referred to the corporation as Sarita Specialties, Inc. and the Secretary of State carried the name as Sarita Specialties. Further, the required fee

was not sent to the Secretary of State. Thus, the name change was not effective and Safari Specialties was not registered as a corporation with the Secretary of State.

2. Article 4.06 provides that no amendment shall affect any existing cause of action in favor of or against such corporation.

*Inc. v. McLaughlin,* 943 S.W.2d 426, 432 (Tex.1997). In *ACS,* a tortious interference case, the court held that "a corporate officer or director may not be held liable for inducing the corporation to violate a contractual obligation as long as he or she acts in good faith on the corporations's behalf." *Id.* To impose individual liability, the plaintiff must show that the officer acted in a manner so contrary to the corporation's best interests that his actions could only have been motivated by personal interest. *Id.* Because the complaint letter was sent in SSI's best interest and not motivated by personal interest, the appellants argue that they are not personally liable. We agree, however, with Graham and Wren that the language in *ACS* does not apply because it is limited to tortious interference with contract cases.

Accordingly, we find that King, Barker, and Holley are individually liable because they knowingly participated in a tortious act. Therefore, we need not determine whether SSI was a legal corporation and, if not, whether the defendants were partners. We overrule the third issue.

### DIRECTED VERDICT

■ In their cross-appeal, Graham and Wren allege that the court erred in granting a directed verdict in favor of Dorsey and Berlanga. When reviewing the granting of a directed verdict, we must determine whether there is any evidence of probative force to raise a fact issue on the material questions presented. *See Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). We consider all of the evidence in a light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *See Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). If there is any conflicting evidence of probative value on any theory of recovery, a directed verdict is improper and the case must be reversed and remanded for jury determination of that issue. *Id.*

### A. Dorsey

■ Graham and Wren argue that Dorsey participated in and approved the malicious prosecution while the investigation was pending. As evidence that Dorsey participated in the malicious prosecution, Graham and Wren point to the fact that Dorsey was told after the letter was sent that his name was listed as a shareholder of SSI and Dorsey approved the letter at a director's meeting. Dorsey asserts that he had no knowledge of the letter until after it had been sent and, therefore, could not have procured the prosecution. Graham and Wren presented no further evidence of Dorsey's involvement.

Because we find no evidence of any probative value to raise a fact issue on Dorsey's involvement, the court did not err in granting a directed verdict. We overrule the first issue.

### B. Berlanga

■ Although Berlanga had been a shareholder in Sarita Safaris, Inc., he had no involvement with SSI. King testified that he believed that Dorsey was going to give some shares of SSI to Berlanga. Because of this belief, King testified that he listed Berlanga as a shareholder of SSI in his letter to the Kerr County Sheriff's Department. According to testimony, Dorsey never gave Berlanga any shares of SSI. Graham and Wren admit that Berlanga did not participate in the malicious prosecution but argue that he should be liable as a partner or an implied partner. Because Berlanga never filed a verified denial to the allegation of partnership, Graham and Wren allege that Berlanga

admitted his partnership status. In response to the failure to deny partnership status, Berlanga argues that Graham and Wren waived this allegation because they did not raise this complaint during presentment of the motion for directed verdict. Because Berlanga did not participate in the formation of SSI or in its operation, there is no evidence to show that he was a partner, even if SSI was found to be a partnership rather than a corporation.

Because we find no evidence of any probative value to raise a fact issue on Berlanga's involvement, the court did not err in granting a directed verdict. We overrule the second issue.

## FRIVOLOUS APPEAL

Dorsey and Berlanga argue that the appeal of the directed verdicts was frivolous and they request the award of attorney's fees and expenses. *See* Tex.R.App.P. 45. Dorsey and Berlanga contend that they had no involvement with the malicious prosecution and Graham and Wren should have dismissed them. We decline to find the appeal frivolous. *See Campos v. Investment Mgmt. Props., Inc.*, 917 S.W.2d 351, 356 (Tex.App.—San Antonio 1996, writ denied) (finding that damages for frivolous appeal will be imposed only if record shows appellant has no reasonable expectation of reversal and has not pursued the appeal in good faith).

## CONCLUSION

Because we find the evidence legally and factually sufficient to support the jury's finding of malicious prosecution and damages, we affirm the judgment of the court. Further, we affirm the directed verdicts as to Dorsey and Berlanga.

Dissenting opinion by GREEN, J. joined by DUNCAN, and ANGELINI, JJ.

PAUL W. GREEN, J., dissenting.

It is frequently said that actions for malicious prosecution are not favored in the law. This aphorism is far too vague to serve as an analytical tool. As with any other cause of action, if the elements of malicious prosecution are proved, liability is established. What is distinctive about malicious prosecution is that there is little room for error in applying the law. Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct.

*Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 291 (Tex.1994) (citations omitted). We are thus admonished to exercise extreme care when applying the facts to the multiple legal elements of malicious prosecution cases. The "delicate balance" can teeter on even a single element of the cause of action and, depending on whether a court strictly applies the law, an already bad situation can get even worse. As grievous as it is for an innocent person to be wrongly accused of a crime, that harm is not fairly compensated by holding the accuser who acted in good faith liable for wrongful prosecution. The legal protection afforded the good faith accuser is in the requirement that we hold the plaintiff to a strict burden of proof. Otherwise, overriding sympathy favoring the innocent plaintiff may lead to an unjust jury verdict. That is what I believe has happened in this case.

\* \* \*

As a matter of good social policy, most would agree citizens should not be discouraged from reporting what is believed to be criminal conduct. But there are risks in doing so. One of the risks is that they will be sued by the subject of the criminal report. When the criminal reporting is

reckless or malicious, the law provides a remedy. But what about cases where the complainant is acting in good faith, although misguided or misinformed? How does society weigh the social value of reporting crime against the damage done to the innocent target of a misinformed criminal complaint? The supreme court says these competing interests are balanced through careful definition of the elements of the malicious prosecution cause of action. *See id.*

One of the basic elements of any tort action is causation. The same is true with malicious prosecution cases. *Id.* at 292. But the supreme court has adopted the view that "initiation and procurement," rather than the more general concept of causation, is better suited to malicious prosecution cases. *Id.* at 293. That is to say, the question is not whether the defendant "caused" the criminal proceedings, but whether the defendant "initiated" or "procured" the prosecution. *Id.* In this case, the question is whether King and his co-defendants (collectively referred to as "King"), "procured" the indictment against Graham and Wren.

The concept of procurement is essentially the same as the cause-in-fact element of proximate cause, but it does not include the foreseeability component of proximate cause. *Id.* at 292.

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false.

*Id.* at 293. Thus, when a prosecutor exercises discretion in deciding whether to prosecute, a malicious prosecution defen-

dant cannot have procured the prosecution unless the defendant provided information he knew to be false and the false information was *a determining factor* in the decision to prosecute. *See id.* at 293–94. In other words, any false information must have been relied upon in some way by the person making the decision to prosecute; otherwise, there is no procurement.

There is no procurement in this case. Even assuming King's complaint letter to the district attorney purposely omitted information or contained information known to be false, the evidence clearly demonstrates the district attorney did not base his decision to prosecute on any of the allegedly false or omitted information.

Graham and Wren contend the complaint letter King sent to District Attorney Sutton falsely asserted that hunters had been booked by SSI during the final week of October and that Graham and Wren had not reserved any animals. Moreover, they argue King's failure to disclose the existence of 99 phone calls Graham and Wren had made to SSI contributed to their prosecution. They also say the price sheets attached to the letter agreement between the parties should not have been omitted from the complaint letter, that Hugo Berlanga's name should not have been shown as a SSI shareholder, and that the corporate name of SSI should not have been used because it had not been successfully filed with the Secretary of State.

However, the evidence is undisputed that any inaccuracies or omissions in King's letter were not a determining factor in DA Sutton's decision to prosecute. Both Sutton and Deputy Sheriff Alford testified the omission of the price sheet, the use of Berlanga's name, and the use of SSI's corporate name played no part in the decision to investigate and prosecute. And regarding the statement that hunts had been booked, Sutton said the issue was whether money had been taken for a par-

ticular purpose and not applied to that purpose, not whether any hunters had been booked.

In light of Sutton and Alford's testimony, it cannot reasonably be concluded the prosecution would not have occurred but for the allegedly false statements in King's letter. To hold otherwise is to say that King is liable regardless of whether the complaint letter contained knowingly false information. The nexus between conduct and harm is missing and, consequently, Graham and Wren's case must fail. Moreover, by upholding the jury verdict, the majority permits the jury to find, in the absence of contrary evidence, the exact opposite of Sutton and Alford's testimony. This is clearly wrong.

In short, the jury's verdict is not supported by the evidence. And by failing to pay strict attention to the "exact prerequisites for liability," the majority has fallen into the error warned about in *Lieck*. Consequently, I dissent.