**PIONEER NATURAL RESOURCES USA, INC., f/k/a Parker & Parsley Petroleum USA, Inc., Parker & Parsley Development, L.P., Appellants,**

v.

**W.L. RANCH, INC. and Carl Flentge, Appellees.**

No. 13–00–617–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Feb. 12, 2004.

C. Kelvin Adams, Beirne, Maynard & Parsons, Houston, Lewis Titus Leclair, Attorney At Law, Dallas, Marc L. Skeen, Irving, W. Stephen Rodgers, Rodgers, Miller & McLain, P.C., Bryan, W.M. Wilson Jr., McKool Smith, P.C., Dallas, for Appellants.

Donald G. Jones, John J. McKetta III, Erin A. Connors, Graves, Dougherty, Hearon & Moody, Austin, and Scott Williams, Attorney At Law, Houston, for Appellees.

Before Justices HINOJOSA, DORSEY[1] and MAURICE AMIDEI.[2]

## OPINION

Opinion by Justice MAURICE AMIDEI (Assigned).

W.L. Ranch, Inc. filed suit against Pioneer Natural Resources USA, Inc., f/k/a Parker & Parsley Petroleum USA, Inc., Parker & Parsley Development, L.P. and Parsley Petroleum Co. (Pioneer), for trespass, negligence, common law fraud, and statutory fraud[3] regarding a horizontal well drilled pursuant to an oil and gas lease. Pioneer appeals from a judgment favoring W.L. Ranch, Inc. which resulted from a partial summary judgment, a jury trial, and a bench trial.

Appellant presents seven issues claiming the drilling of the well did not constitute trespass because unitization kept the oil and gas lease between the parties in force and effect at all times during the drilling of the well. Appellant further argues that there is no evidence of negligence, fraud or damages to appellee. We reverse and render.

### Factual and Procedural Background

Appellant was the lessee under an oil and gas lease covering 103.75 acres of appellee's land in Burleson County, Texas. The lease provided a "primary term" of one year from August 20, 1993, and as long thereafter as "operations" were conducted upon "said land," i.e., the 103.75 acres described in the lease. The lease authorized pooling or unitization with other lands upon which "operations" could be conducted to extend the primary term in the absence of operations on appellee's land.

On June 28, 1994, appellee executed an amendment to the lease increasing the maximum size of a production unit from 320 to 380 acres. Prior to August 20, 1994, appellee's 103.75 acres was assigned to the Newberry HU No.1 production unit. Appellant pooled appellee's 103.75 acres

---

1. Retired Justice J. Bonner Dorsey, who had been assigned to this Court by the Supreme Court of Texas pursuant to section 74.003 of the government code, and whose assignment expired on August 31, 2003, did not participate in this decision. *See* TEX. GOV'T CODE ANN. § 74.003 (Vernon Supp.2004).

2. Former Justice Maurice Amidei assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon Supp.2004).

3. *See* TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 2002).

with 274.97 acres from three other tracts to form a 378.72 acre production unit also known as the "Newberry Unit."

Pursuant to a permit appellant obtained from the Texas Railroad Commission to drill a horizontal well on the "Newberry Unit," appellant spudded in or commenced drilling on the Newberry tract of the "Newberry Unit" on August 11, 1994. The well was drilled horizontally under appellee's land 1,150 feet in the Buda formation, and 1,150 feet in the Austin Chalk formation, although the well bore did not penetrate appellee's land until after August 20, 1994. The well was completed and placed into production on October 18, 1994. The well was plugged on January 16, 1999, because the production from the well was not sufficient to repay appellant's drilling expenses. The production revenues were $644,893, whereas appellant's drilling expenses were $1,677,700 and its production expenses were $221,213. Appellee received $43,163 royalties from the well production.

Appellant and appellee filed motions for summary judgment regarding whether the lease terminated because appellee commenced operations on the Newberry tract instead of appellee's tract, and the well bore did not penetrate appellee's land until after the end of the primary term of the lease, i.e., August 20, 1994. The trial court entered a partial summary judgment holding that the lease terminated.

Thereafter, appellee's claims were submitted to the jury, which upheld all of appellee's claims and denied appellant's defenses. Then a bench trial was held as to attorney's fees, expert witness fees, and costs of copies of depositions. The trial court awarded appellee $264,000 in attorney's fees, $88,668 prejudgment interest, and $39,675 for expert witness fees and costs for copies of depositions.

## Standard of Review for Summary Judgment

We review the trial court's granting of a motion for summary judgment *de novo*. *Acceptance Ins. Co. v. Lifecare Corp.*, 89 S.W.3d 773, 777 (Tex.App.-Corpus Christi 2002, no pet.). In a traditional motion for summary judgment, the movant has the burden of showing, with competent proof, that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). If the movant's motion and summary judgment proof facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a material fact issue sufficient to defeat summary judgment. *HBO v. Harrison*, 983 S.W.2d 31, 35 (Tex.App.-Houston [14th Dist.] 1998, no pet.).

When a trial court grants a summary judgment, the losing party appeals, and an appellate court finds reversible error in the judgment, the appellate court's normal action is to reverse the trial court's judgment and remand the cause to the trial court. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). An exception may occur when both parties moved for judgment and one such motion was granted, but the other denied. *Id.* Then the appellate court should determine all questions presented, and may reverse the trial court judgment and render such judgment as the trial court should have rendered, including rendering judgment for the other movant. *Id.*

An oil and gas lease is construed in accordance with the rules of construction applicable to contracts, and the primary rule is to ascertain the true intention of the parties. *Heritage Res., Inc. v. Nati-*

*onsBank,* 939 S.W.2d 118, 121 (Tex.1997). The court will not strike down any portion of the contract unless there is an irreconcilable conflict. *Ogden v. Dickinson,* 662 S.W.2d 330, 332 (Tex.1984).

## Issues Presented

Appellant's first issue claims the trial court erred in denying appellant's motion for partial summary judgment and in granting appellee's motion for summary judgment, thereby finding that the oil and gas lease in question was not kept in force after August 20, 1994. In its motion for summary judgment, appellee argued that the oil and gas lease terminated when the well bore did not penetrate appellee's land until after August 20, 1994, and therefore appellant committed trespass to appellee's property. The trial court granted appellee's motion and held the lease was not kept in force after August 20, 1994, by the drilling operations commenced by appellant on the Newberry tract.

Appellee argues the primary term[4] of the lease was not extended by the pooling provisions of the lease.[5] According to appellee, the addendum which provides for termination at the expiration of the primary term, or any time thereafter if oil or gas is not being produced in paying quantities from the lease premises, or the lessee is not then engaged in the actual drilling operations on the lease premises,[6] conflicts with lease provisions as to pooling, and controls by virtue of another addendum provision making the addendum controlling to the extent of the conflict.[7] Specifically, appellee claims the language in the first sentence of paragraph 17 of the addendum conflicts with paragraph 4 of the lease and overrides the pooling provisions because it only allows production or actual drilling on appellee's 103.75 acres to maintain the lease beyond the primary term.

▪ When the provisions of a contract appear to conflict, they should be harmonized if possible to reflect the intentions of the parties. *Ogden,* 662 S.W.2d at 332. Generally, the parties to a contract intend every clause to have some effect

4. Paragraph 2 of the Oil and Gas Lease provides as follows: "Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of one (1) years from the date hereof, hereinafter called 'primary term', and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days."

5. Paragraph 4 of the Oil and Gas Lease provides in pertinent part as follows: "Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease or leases ... Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease."

6. Paragraph 17 of the Addendum to the Oil and Gas Lease provides as follows: "If at the

expiration of the Primary term or any time thereafter, oil or gas is not being produced in paying quantities from the lease premises, or Lessee is not then engaged in the actual drilling operations on the lease premises, this lease shall terminate as to all lands and horizons covered hereby. Lessee shall maintain the lease with respect to producing acreage at the end of the primary term from the surface to a depth of 100 feet below the stratigraphic equivalent of the deepest productive formation in any well pooled with or drilled on the 103.75 acres during the primary term."

7. Paragraph 11 of the Addendum to the Oil and Gas Lease provides as follows: "In the event of conflict between the provisions of this addendum and the provisions of the foregoing oil and gas lease, the terms and provisions of this addendum shall control to the extent of the conflict."

and the Court will not strike down any portion of the contract unless there is an irreconcilable conflict. *Id.*

■ If the second sentence of paragraph 17 is read with its first sentence it is clear that the parties did not intend to eliminate pooling from the lease. The second sentence includes production from *any well pooled with or drilled on the 103.75 acres* which will extend the primary term of the lease. (emphasis supplied). Appellee does not mention the second sentence in its argument. Appellee claims that paragraphs 2 and 4 conflict because paragraph 2 limits the term extending operations to "said land" or the appellee's 103.75 acres, whereas paragraph 4 includes operations on any part of any land unitized with the 103.75 acres. Considering all of the provisions of the lease and the addendum, no language expressly prohibits or limits pooling.

■ One of the legal consequences of a unitized lease as between the lessor and the lessee, *in the absence of express agreement to the contrary,* the life of the lease is extended as to all included tracts beyond the primary term and for as long as oil, gas or other minerals are produced from any one of the tracts included in the lease, with each lessor relinquishing his right to have his own tract separately developed. *Southland Royalty Co. v. Humble Oil & Ref. Co.,* 151 Tex. 324, 249 S.W.2d 914, 916 (1952) (emphasis added). In short, the parties, by the execution of a unitized lease, agree that production of oil or gas from wells located on any tract included in the lease will be regarded during the life of the lease as production from each and all other tracts included therein. *Id.* In the instant case, the appellant and appellee

agreed to a unitized lease without an express agreement that the lease could not be extended by commencement of operation or production on land other than appellee's. Even if there were a conflict as contended by appellee, it is not an irreconcilable conflict, and it is reasonable to conclude the parties intended to agree to the pooling or unitization which was effected by appellant.

The trial court erred in granting appellee's motion for partial summary judgment and such error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1). The effect of the error deemed appellant a trespasser prior to the jury trial. Appellant could not defend on the basis the lease was in full force and effect at the time it drilled the well and appellant was therefore authorized by appellee to drill on or under appellee's land.

Appellant's issue number one is granted. We reverse the trial court's partial summary judgment, and its award of $220, 059 trespass damages to appellee. We render judgment the trial court should have rendered, and hold as a matter of law the oil and gas lease between appellant and appellee did not terminate on August 20, 1994, as the drilling operations commencing on the Newberry tract effectively extended the primary term of the lease by virtue of the unitization with other tracts into the Newberry HU–No.1 production unit. *See Jones,* 745 S.W.2d at 900 (appellate court may reverse and render when considering conflicting motions for summary judgment).

Appellant's second issue states there is no evidence that appellant was negligent in the way it drilled the Newberry horizontal well.

■ Appellant objected [8] to the testimony of Tom Kitching, appellee's only expert, on grounds that Kitching was not qualified as an expert on drilling horizontal wells, and he did not establish a standard of care for drilling a horizontal well. Although Kitching had experience drilling vertical wells, he admitted he did not have any experience in drilling horizontal wells which are more complex than vertical wells. Although Kitching testified about some problems appellant had in drilling the well, he did not establish an applicable standard of care or that any problems resulted from a violation of the standard of care. Appellee failed to prove Kitching was a qualified expert to express an opinion as to negligence in drilling a horizontal well, or establish a standard of care in such connection. *Broders v. Heise,* 924 S.W.2d 148, 149, 152–53 (Tex.1996) (offering party has burden to establish that the expert has "knowledge, skill, experience, training, or education" regarding the *specific issue* before the court which would qualify the expert to give an opinion on *that particular subject*) (emphasis supplied); *see also Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719, 727 (Tex.1998).

In reviewing the evidence under a no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Assoc. Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force to support the finding, the courts will overrule the no evidence point. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (1997). Kitching's testimony was not probative and should have been excluded as it was shown he was not a qualified expert regarding horizontal wells.

■ Appellee claims that even if Kitching's testimony is excluded, appellant's own experts' testimony offered proof that appellant was negligent. According to appellee, problems encountered with the directional drilling equipment prompted the directional drilling subcontractor to credit $50,000 to appellant's account. Appellee did not establish that generally problems with drilling equipment violates a standard of care. The fact that appellant drilled the well at less expense benefitted appellee. Problems with drilling equipment in drilling an oil well is to be expected but cannot be the basis of a negligence cause of action. An oil well driller does not ordinarily guarantee that he will have no problems with the drilling equipment when drilling a well.

Appellee further argues that appellant was negligent because the casing was set 103 feet above the Austin Chalk formation rather at the exact top thereof. Although appellant's expert Peay stated the well would never get drilled if the casing was set in the Taylor shale rather than the Austin Chalk, the fact is that the well was successfully drilled from the place the casing was set. Peay testified that beginning the lateral 103 feet above the Austin Chalk was a "minor detail," not that it violated some standard of care. The well was actually drilled to a lateral distance of 3,069 feet.

Appellee also argues that appellant was negligent because drilling in shale cost more and took more time. However, Peay testified that finding the most productive

---

**8.** The trial court overruled appellant's objection and allowed appellant a running objection to preserve the objection without having to repeat it after every question.

20 feet of the chalk formation, which has random fractures and undulations, is a problem encountered in drilling a horizontal well, and that running into shale is "no big deal." Peay concluded that there was nothing about the way the well was drilled indicated that appellant used poor drilling practices. Further, appellant's other expert Holditch testified that the reason the well did not produce more was because of the poor reservoir quality which was found in all of the wells drilled in that area.

■ Appellee further argues that appellant was negligent because it filed false reports with the Texas Railroad Commission. Assuming there were false reports filed, appellee waived its argument by not citing any supporting authority establishing that such filing is evidence of negligence. Tex.R.App. P. 38.1(h).

Finally, appellee argues that the fact that appellant did not drill any more horizontal wells in the area is indicative of negligence. Appellee waived its argument by not developing a concise argument or citing any authority establishing that such failure to drill is evidence of negligence. *See id.*

While the jury could disbelieve the testimony of appellant's experts, they could not use such evidence for the basis of making an affirmative finding exactly contrary to the facts testified to by these experts. *Hawkins v. Campbell,* 226 S.W.2d 891, 897 (Tex.Civ.App.-San Antonio 1950, writ ref'd n.r.e.). The jury could not find the converse of such testimony in the absence of independent evidence to support such finding. *Schwartz v. Pinnacle Communications,* 944 S.W.2d 427, 434 (Tex.App.-Hous-

ton [14th Dist.]1997, no writ); *Rep. Nat. Life Ins. Co. v. Heyward,* 568 S.W.2d 879, 883 (Tex.Civ.App.-Eastland 1978, writ ref'd n.r.e.). There is no such independent evidence to support the jury's finding in question number two that appellant was negligent. The jury could not find appellant was negligent by using the testimony of the appellant's experts. Appellant's objections[9] that there was no evidence and factually insufficient evidence to find the drilling of the well was negligent were overruled by the trial court.

Appellant's second issue is granted. There being no evidence of appellant's negligence, we set aside jury findings answering jury questions number two (negligence), number three (proximate cause) and number four (negligence damages).

■ In its issues three and four, appellant claims that its drilling was not the proximate cause of any injury to appellee, and there was no proof of damages for negligence. Because of our ruling on issue number two that there was no evidence of negligence, we grant appellant's issues numbers three and four. In any event, appellee could not have been damaged because the uncontradicted testimony of appellant's expert established that all the available reserves were recovered from the horizontal well. It is axiomatic that if there are no reserves available, there can be no royalties which could be lost as claimed by appellee. Thus, there could not be any drainage or loss because no other operator would lease and drill appellee's property as claimed by appellee. During the time appellant operated under the lease, it adequately protected appellee's property from drainage by unitizing

---

9. Appellant's objection was made (1) to the submission of jury question number two inquiring as to whether appellant was negligent, (2) in appellant's motion for a directed verdict, and (3) in appellant's motion for a new trial.

the property with other tracts. *Southeastern Pipe Line Co. v. Tichacek,* 997 S.W.2d 166, 170 (Tex.1999). The documents filed with the Texas Railroad Commission do not reveal anything which taint the marketability of the mineral estate in appellee's property. The fact that all of the available oil has been removed might deter any prospective operator.

■ In it's fifth and sixth issues, appellant asserts there is no evidence or insufficient evidence that appellee suffered any injury or was damaged by any fraud. Appellee alleged that it was induced to execute an amendment to the oil and gas lease increasing the maximum size of the unit from 320 to 380 acres by two misrepresentations by Gary Lang, appellant's employee. Lang made the statements as to past or existing facts as follows: (1) appellant planned to drill a horizontal well with three 4500 foot laterals (horizontal well bores), and (2) based on Texas Railroad Commission rules, appellant needed 380 acres in order to drill the 4500 foot laterals. Appellee's witnesses admitted in their testimony that the representations were not promises to drill three 4500 foot laterals. It was not established that appellant would not have drilled the 4500 foot laterals if necessary, or that 4500 foot laterals would have been more of a benefit to appellee than the laterals actually drilled.

Appellant was entitled to drill the Newberry well even without the amendment. The alleged misrepresentations were not promises to induce the execution of the amendment and obviously are not false misrepresentations of past or existing material facts as found by the jury in question number 5. Appellant objected to the submission of jury question number 5 because (1) there was no evidence, and factually insufficient evidence to support its

submission, and (2) it was overly broad and failed to limit the jury to specific alleged acts of fraud.

■ Jury question number 5 further inquired whether the fraud injured appellee. If there is fraud in the inducement, out of pocket damages (the difference between the value paid and the value received) or the benefit-of-the-bargain damages (difference between the value as represented and the value received) are the recognized measures of damages. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex.1998). Over appellant's objection, the trial court submitted both measures in jury question number 7, and the jury found $511,000 in damages for each measure.

■ Even assuming Kitching's testimony was admissible, he did not testify as to the elements of the measures of damage submitted to the jury. Kitching's testimony was that appellee lost royalties in the amount of $511,000. Lost royalties would not be either out of pocket to appellee or the benefit of the bargain because appellee did not pay anything for the amendment, and the appellant did not represent any value to appellee with appellee receiving $43,163 royalties, the benefit of its bargain. The injury suffered in a fraud case must be directly traceable to, and which resulted from, the false representation upon which the injured party relied. *McCurry v. Aetna Cas. & Sur. Co.,* 742 S.W.2d 863, 867 (Tex.App.-Corpus Christi 1987, writ denied). Appellee has not advanced a concise argument that lost royalties are traceable to the alleged misrepresentations, and has not cited any authority to support such position. Such violations of the briefing rules by appellee waives its

position on the issue. TEX.R.APP. P. 38.1(g),(h).

If appellant became a trespasser because the oil and gas lease terminated on August 20, 1994 as claimed by appellee, all of the mineral interest reverted to appellee, including any royalty interest. *Jupiter Oil Co. v. Snow,* 819 S.W.2d 466, 468 (Tex.1991) (grantor's possibility of reverter in the mineral estate becomes a present possessory interest only upon the termination of the lease). Under appellee's theory, at the time of the alleged trespass or drilling under appellee's property, the mineral estate (ownership of the oil and gas in place) reverted to appellee, and the royalty interest it previously owned terminated. The jury finding of $511,000 damages to compensate appellee for fraud was based on Kitching's estimate of lost royalties which was calculated using appellee's percentage interest in the unit, although appellee no longer owned an interest in the unit. His calculations included all of the tracts in the unit, but he admitted he could not allocate how much oil came from each of the tracts. There is no evidence of the amounts of remaining reserves remaining under the tracts of the unit or under appellee's property. Kitching's estimate was not based on the amount of oil remaining. The amount of remaining oil under appellee's property is not related to the unit or appellee's previous percentage interest therein. Therefore, there being no damage to the reservoir, and no royalties owned or lost by appellee, the jury finding of $511,000 in question number 4 for negligence damages, and the jury finding of $511,000 in question number 7 for fraud damages were based on incorrect and irrelevant calculations of an unqualified expert. There was no evidence of the value of the amendment or that appellee paid or parted with anything of value by agreeing to the amendment, but appellee did receive unspecified valuable consideration as stated in the amendment and was paid $43,163 royalties. There is no evidence appellee was injured because of the amendment.

There is no evidence to support the trial court's submission of jury question number 7 and the jury's answers thereto. Appellant's fifth and sixth issues are granted, and we disregard and set aside said jury question and findings number 7. The submission of question number 7 to the jury probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1).

■ Appellant complains in its seventh issue that appellee failed to prove any basis for the exemplary damages it was awarded. Considering that we have discussed and held in the foregoing issues that appellee is not entitled to recover actual damages from appellant, appellee cannot recover exemplary damages. *Schlueter v. Schlueter,* 975 S.W.2d 584, 589 (Tex.1998). Appellant argues that because there was legally and factually insufficient evidence to support the jury's award of actual damages for fraud, there is legally and factually insufficient evidence to support the jury's award for exemplary damages. *Porras v. Craig,* 675 S.W.2d 503, 505 (Tex.1984). We agree. The trial court erred in overruling appellant's objections [10] and in granting $299,000 exemplary damages to appellee because there was no evidence of actual damages, which is a necessary prerequisite to an award of exemplary damages. *Id.* The submission of

---

**10.** Appellant objected to the submission of question 8 to the jury and in its motion for judgment n.o.v and motion for new trial.

question number 8 to the jury probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1).

Appellant's issue number seven is granted, and we disregard and set aside said jury question and finding number 8.

Because appellee is not the prevailing party, we set aside the trial court's findings and award of attorney's fees, interest and court costs, including costs of depositions to appellee. TEX.R. CIV. P. 131; *see* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). We reverse and render judgment that appellee take nothing from appellant; and appellant shall recover judgment against appellee for court costs, including costs of depositions. TEX.R.APP. P. 43.2(c).