

# NUMBER 13-07-00460-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

SOUTH TEXAS FREIGHTLINER, INC.,                                    **Appellant,**

**v.**

FRANCISCO MUNIZ AND
MARGARITA MUNIZ,                                                    **Appellees.**

### On appeal from the 138th District Court
### of Cameron County, Texas.

# O P I N I O N

### Before Chief Justice Valdez and Justices Yañez and Benavides
### Opinion by Chief Justice Valdez

Appellant, South Texas Freightliner, Inc. (hereinafter "STF"), appeals a $117,000 civil judgment for malicious prosecution rendered in favor of appellees, Francisco and Margarita Muniz (collectively "the Munizes").[1] By three issues, STF contends that the (1)

---

[1] Margarita was awarded nothing in the final judgment. Her name, however, appears in the notice of appeal and is therefore docketed in the style of this case.

evidence is legally and factually insufficient to support three elements of a malicious prosecution claim; (2) evidence is legally and factually insufficient to support the damages; and (3) trial court erred in calculating prejudgment interest. We affirm.

## I. BACKGROUND

On April 13, 2000, Francisco was indicted for a state-jail felony theft charge. *See* TEX. PENAL CODE ANN. § 31.03(e)(4) (Vernon Supp. 2008) (providing that it is a state-jail felony to steal property valued at $ 1,500 or more but less than $20,000). The indictment alleged that Francisco failed to disclose a second lien, which was held by Valley Trucking, on a 1993 Freightliner that Francisco traded-in to STF in connection with the purchase of a new truck. This indictment was dismissed, but Francisco was subsequently re-indicted on August 23, 2003. After a week-long jury trial, Francisco was acquitted on November 12, 2004.

On August 6, 2002, the Munizes sued STF for malicious prosecution, but that suit was non-suited. On December 15, 2004, the couple re-filed a malicious prosecution suit against STF. The case was tried to a jury in January 2007. The testimony and evidence came from the following individuals: (1) Valley Trucking employees, who testified about a promissory note executed by the Munizes; (2) STF employees, who recounted the sales process; (3) a police officer, who explained his investigation; and (4) the Munizes, who relayed their understanding of the promissory note, sale, and criminal prosecution.

## A. Valley Trucking Employees

Sofia Garza, the office manager of Valley Trucking, testified that she typed a promissory note that was executed by Richard Carruthers, vice president of Valley

2

Trucking, and the Munizes. The note, dated June 9, 1998, references Francisco and Margarita as the lenders and Valley Trucking as the borrower,[2] and states in relevant part:

TERMS FOLLOWING A ☐ APPLY ONLY IF CHECKED

NOTE - For value received, I promise to pay you, or your order, at your address above, the principal sum of: Eleven thousand six hundred nineteen Dollars $11,619.00 plus interest from _____ at the rate of ___ % per year until _____.

PAYMENTS - I will pay this note as follows:
(a) ☐ In 12 payments. The first payment will be in the amount of $ 1,040.51 and will be due July 9, 1998. A payment of $ 1040.51 will be due on the 9th day of each month thereafter.

. . . .

SECURITY - You have certain rights that may affect my property as explained on page 2. This loan ☒ is ☐ is not further secured.
(a) ☐ This loan is secured by _____, dated ____.

(b) ☐ Security Agreement - I give you a security interest in the Property described below. The rights I am giving you in this Property and the obligations this agreement secures are defined on page 2 of this agreement.

Keep insurance on 1993 Freightliner tractor vin# 1FUYDSYBXPP485198 with Valley Trucking as loss payee.

Garza testified that she did not check either the (a) or (b) box under the "SECURITY" section and that she "put down up at the top of that [section of the note that it] was secured but [she] didn't write down what it was securing." Garza testified that STF eventually paid the outstanding balance on the 1998 note and the "lien was released."

On redirect examination by the Munizes' attorney, Garza was asked whether the 1998 note created a second lien. Garza responded that it did not. Then she was asked,

_____

[2] A note for $9,000, which is dated November 26, 1997, was also admitted into evidence. Garza testified that the Munizes "renewed" the 1997 note and rolled the outstanding balance into the 1998 note. Additionally, subsequent testimony reveals that the note erroneously refers to the Munizes as lenders when they were in fact borrowers.

"So, if [Francisco] goes out and tells people there is no second lien, he is not misrepresenting anything, is he?" Garza responded, "No, sir."

Richard Carruthers testified that the 1998 note "wiped-out" the 1997 note. On cross-examination by STF's counsel, Carruthers testified that he discussed the 1993 Freightliner's financing agreement with the Munizes, and Francisco was aware he had to pay off the note before he could trade in the Freightliner. Carruthers testified, "I told him to make sure that he was getting a trade-in where he can get his equity out, where he wouldn't be upside on the deal . . . ."

## B.    STF Employees

Angel Beltran, a former STF salesman, testified that he would help customers complete credit applications, but he could not remember if he specifically and consistently asked customers if a truck proposed as a trade-in was secured by a second lien. During Beltran's testimony, the trial court admitted a Mercedes-Benz Credit Corporation application that Francisco signed; its only reference to liens was to whether the applicant had any "tax liens." The application contained sections titled "Bank/Mortgage Company References" and "Equipment Financing and Leasing References."

Stacy Gillard, a former STF finance manager, testified that she reviewed the original Texas title to the traded-in 1993 Freightliner and discovered that Valley Trucking claimed a second lien on the truck. In March 1999, Gillard was directed by her supervisor to go to the Pharr Police Department and provide a statement regarding the 1993 trade-in vehicle. On March 30, 1999, STF paid the balance on the 1998 note. On cross-examination by STF's counsel, Gillard testified that Francisco had to know about the second lien because he signed a title application acknowledging the second lien by Valley Trucking in order for

4

that second lien to appear on the title.

Eddie Vaughan, STF's president, testified that he sent a letter to the Pharr Police Department alleging that Francisco's credit application did not accurately disclose a second lien. The letter, dated September 1, 1999, states:

> I, Eddie Vaughan, owner and president of South Texas Freightliner, wish to press criminal charges against Mr. Francisco Ruiz [sic].
>
> On December 10, 1998, Mr. Ruiz [sic] approached South Texas Freightliner about purchasing a new 1999 Freightliner Classic XL. He completed a credit application and a retail buyers order on which he stated the lien against his trade-in vehicle was with First Valley Bank for the approximate amount of $28,000. This payoff amount was confirmed with First Valley Bank, and Mr. Muniz signed a contract for and took delivery of his new Freightliner. Several days later, the title for the trade-in was received from First Valley Bank, and it was discovered that Mr. Muniz had a second and previously undisclosed lien on the vehicle. Mr. Muniz was contacted, and he denied knowledge of the second lien. The second lienholder, Valley Trucking, was contacted, and they provided us with documentation of the loan to Mr. Muniz and the lien. In order for South Texas Freightliner to perfect its lien on the 1993 trade-in, it was necessary to pay this note off also. The note was for $11,655.81.

Vaughan testified that he learned of a possible lien on the 1993 Freightliner when STF received the title from First Valley Bank. STF then reported the incident to the police department and paid Valley Trucking the promissory note's balance. Vaughan further testified that he went to the authorities in an attempt to collect what, in his belief, was an $11,655.81 debt that Francisco owed to STF.

Vaughan also testified that in March 1999, STF received a notice that the Munizes had filed for bankruptcy. Vaughan noted that STF did not file a claim against the Munizes' bankruptcy estate because he did not believe STF would get any money from the Munizes through a bankruptcy proceeding.

## C.    Sergeant Guerrero

5

Gilberto Guerrero, a sergeant with the Pharr Police Department, testified that Gillard filed a police report against Francisco. Sergeant Guerrero then investigated the case, spoke with the district attorney's office regarding potential charges and their viability, and obtained a warrant for Francisco's arrest. Sergeant Guerrero viewed the case as purely criminal in nature and testified that the police department did not engage in debt collection for private parties.

**D.    Margarita Muniz**

Margarita testified that Francisco had been a truck driver since 1995. On the morning of December 7, 1998, the couple visited STF to purchase a truck for Francisco's business. After the couple found a suitable truck, Margarita spoke with Jaime Valdez, a STF employee. Margarita testified that Valdez asked her questions that were on a credit application and that she answered every question. When the application was complete, Francisco signed it, and, STF submitted it to the finance company for review. Margarita did not recall being asked if the trade-in was secured by a second lien. However, she claimed to have provided Valdez with a non-negotiable title that did not show a second lien. The finance company approved the application, and the Munizes left with a brand-new 1999 Freightliner.

A month after the purchase, Valdez telephoned Margarita to inform her that Valley Trucking held a second lien on the trade-in. According to Margarita, she and Francisco had a personal loan with Valley Trucking, "but it had nothing to do with the truck." Margarita testified that Valdez was rude and used bad language when he told her to tell her husband "that if he didn't pay in three days, $12,000, he was going to get screwed and he was going to go to jail." Margarita offered to return the new Freightliner in exchange for

6

the trade-in, but Valdez told her that the trade-in had already been sold. When Francisco returned home from a long-haul trip, Margarita told him about the conversation with Valdez. She then sought advice from a bankruptcy lawyer, and the couple filed for bankruptcy in March 1999.

During the summer and fall of 1999, Sergeant Guerrero telephoned the Muniz home regarding a criminal investigation. He spoke to Margarita and, once when Margarita was away from the house, to Francisco Jr., the couple's eighteen-year-old son. When Margarita returned home, Francisco Jr. told her that Sergeant Guerrero had called and told him that the police would arrest Francisco if he did not pay STF. Margarita testified that Francisco Jr. and her two minor children cried in reaction to the news. Margarita felt like she "had no way out," that her husband would be deported to Mexico if he was found guilty of a criminal charge,[3] and that her family would be left homeless because she could not support them.

Margarita further testified that Francisco was indicted for theft in April 2000, that those charges were subsequently dismissed in October 2001, but he was re-indicted again for theft in August 2003. After Francisco was re-indicted, he was arrested, and spent a weekend in jail. Margarita told the jury how the family was hurt financially by the numerous hearings and the trial because Francisco was a truck driver and every hearing cost him a week's worth of work. Margarita testified:

> Nobody knows what we have been going through. It's hell living like this. My husband couldn't work. How were we going to feed our kids? They would fire him because he had to go to court, and go to court, and court, and court.

The Munizes had to hire an attorney to represent Francisco in the criminal

---

[3] Later in the trial, Francisco testified that he is a resident alien.

7

proceeding. Margarita recalled that the family mortgaged the home that they had owned outright and paid $15,000 in attorney's fees. Margarita recounted that the financial hardship prevented her and Francisco from helping their eldest son attend college and from celebrating their daughter's fifteenth birthday with a "quinceanera," or party.

Margarita further testified that she believed the loan from Valley Trucking was an unsecured note, in part, because the copy of the title to the 1993 Freightliner that she possessed showed First Valley Bank as the only lien holder. Margarita did not realize that the 1993 Freightliner was possibly secured by a second lien until STF paid-off First Valley Bank's interest in the truck and the bank released the original title. When asked about the original title by STF's counsel, Margarita admitted that it denoted a second lien.

## E.    Francisco Muniz

Francisco testified that he had never been charged with a criminal offense or spent time in jail until his arrest for theft. Francisco learned about the problems with the title from Margarita. He spoke to Sergeant Guerrero, who told him that "[n]ot even the bankruptcy is going to save you." Francisco testified that he saw his wife and children cry during the ordeal.

Francisco testified that the family suffered financially during the criminal proceedings. Francisco lost his own truck and became a company driver, but his supervisor did not provide Francisco with consistent work because he was frequently absent due to court hearings. Francisco's supervisor, therefore, asked Francisco to work as a substitute driver and drive a tractor-trailer only when he was available and another driver was out. Francisco testified that the family had trouble putting food on the table and that he had to borrow from friends, which was embarrassing to him because he did not like

8

borrowing money.

Francisco testified that he was arrested twice on theft charges. During his first arrest, Francisco surrendered himself to authorities, was quickly processed, and was released from police custody. The second arrest, however, happened when Francisco was driving a company truck from Houston to the Valley. Francisco was stopped in Kingsville by the police because the tags on his truck seemed out-of-order. During the traffic stop, officers informed Francisco that there was a warrant for his arrest, and they arrested him. The experience was very embarrassing because Francisco was arrested in front of several friends and colleagues. Francisco was further embarrassed when he had to spend a weekend in jail, where he was strip-searched and forced to shower and interact with other inmates. On cross-examination by STF's counsel, Francisco was asked whether he was arrested in Kingsville because he failed to make a court appearance rather than as a direct result of the theft charges. Francisco responded that he made every court appearance, that the arrest was a court mistake, and that the underlying criminal proceeding was a result of STF's actions.

Regarding economic damages, Francisco testified that he could not work for practically six years because the criminal proceedings disrupted his work schedule. He testified his gross wages ranged from $250 to $300 a week.

F.    **Francisco Muniz Jr.**

Francisco Jr. testified that he received a telephone call from Officer Guerrero, that his siblings overheard the conversation, and that they all started to cry because they were afraid that Francisco had already been arrested. Francisco Jr. further testified that his father was vibrant and "the life of the party" before the criminal proceedings. Now,

Francisco just wants to hide from the world. Francisco Jr. believed that his father's attitude changed when he was incarcerated in Kingsville.

## G.    Jury Charge, Judgment, and Motion for New Trial

Question One of the jury charge asked whether, by a preponderance of the evidence, STF maliciously prosecuted Francisco. Regarding Francisco's damages, Question Two instructed the jury to apportion damages for the following: (1) physical pain and mental anguish; (2) loss of earnings and loss of wage-earning capacity; and (3) attorney's fees.[4] Question Three related to Margarita's damages. In Question Four, the jury was asked if Eddie Vaughan acted as an employee of STF. Question Five inquired into whether there was clear and convincing evidence that STF acted with malice.

The jury answered "yes" to the malicious prosecution question, and awarded Francisco $25,000 for past physical pain and mental anguish, $80,000 for past loss-of-earnings, and $15,000 in attorney's fees. The jury declined to award Margarita any damages, and found that STF did not act with malice by clear and convincing evidence, thereby precluding an award of exemplary damages. It did, however, find that Eddie Vaughan acted as an employee of STF. STF moved for a new trial or a modified judgment. The trial court denied the motion for new trial, but it modified the judgment by reducing the attorney's fees award to $12,000. In all other respects, the trial court signed a judgment according to the jury's verdict and awarded Francisco $40,820.12 in prejudgment interest, which was measured from March 5, 2003. This appeal followed.

## II. LEGAL AND FACTUAL SUFFICIENCY

By its first and second issues, STF contends the evidence is legally and factually

---

[4] The physical pain and loss of earning capacity damages were further divided into past and future damages.

10

insufficient to support Francisco's claim for malicious prosecution and damages.

## A.    Standards of Review

When we review a record for legal sufficiency, we view the evidence in the light most favorable to the verdict to determine whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id*. We will sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id*. at 810. More than a scintilla of evidence exists, and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In conducting a factual sufficiency review, we do not substitute our judgment for that of the jury; rather, we view all the evidence in a neutral light to determine whether the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate

bias. *See City of Keller*, 168 S.W.3d at 826; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 749 (Tex. App.–Corpus Christi 2006, pet. denied).

**B.      Malicious Prosecution**

In order to prevail on a malicious prosecution claim, Francisco had to prove by a preponderance of the evidence that:  (1) a criminal prosecution was commenced against him; (2) STF initiated or procured that prosecution; (3) the prosecution terminated in his favor; (4) he was innocent of the charges; (5) STF lacked probable cause to initiate the prosecution; (6) STF acted with malice; and (7) he suffered damages.  *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997).  STF's first issue challenges the sufficiency of the evidence supporting the second (causation), fifth (lack of probable cause), and sixth (malice) elements of Francisco's claim.  We now turn to a discussion of those elements.

*1.      Causation*

The second element of a malicious prosecution claim requires a claimant to present evidence that the decision to prosecute "would not have been made but for the false information supplied by the defendant." *King v. Graham*, 126 S.W.2d 75, 78 (Tex. 2003). STF contends that the letter Vaughan provided to the police truthfully disclosed all of the material information known to Vaughan when he penned it.  Francisco argues that he did not complete the application, but STF employees did, and that Vaughan knew or should have known that the lien Valley Truck had on the 1993 Freightliner was not valid because it rested on a defective promissory note.

12

The record contains evidence that undermines:  (1) STF's assertion that it fully and fairly disclosed the Munizes' alleged deception in the credit application; and (2) the existence and validity of a second lien.  In his letter, Vaughan noted that Francisco's 1993 trade-in truck was encumbered by a "second and previously undisclosed lien."  This statement implies that the Munizes were asked about a second lien and failed to disclose it.  Margarita testified that she completed the application with the assistance of an STF employee and was never asked about a second lien.  Additionally, the credit application does not request thorough and precise responses.  Its request for financial information reads in relevant part:

> Bank/Mortgage Company References:
> Bank Name              Contact          Phone  City      State   Complete Acct. No.
> *First Valley Los Fresnos       956 233-441   Lost Fresnos  Tx*
>           *Gilbert Sanford*
>
> Equipment Financing and Leasing References*:
> Bank/Finance Co.      Contact          Phone  City      State   Account Number

(blank lines omitted).  Because the application used the term "references," did not ask for a description of financed equipment, and did not ask for any and all outstanding balances on financed equipment, the jury could have inferred that the Munizes disclosed as much information as the application required.

There is also evidence that calls into question the existence and validity of the second lien.  Gillard and Vaughan testified that First Valley Bank forwarded STF a title that noted a second lien in favor of Valley Trucking, but the company never introduced a copy of the title showing two liens.  Margarita testified that Valley Trucking provided her and Francisco with an unsecured loan.  A review of the promissory note, which STF had for several months before Vaughan's letter, reveals numerous defects.  For example, the

13

lender's and borrower's names are juxtaposed and the box that would create a security interest is unchecked. Margarita also testified that the title she provided to STF the day they purchased the new truck noted only the bank lien, but neither she nor Francisco introduced a copy of that title. Thus, the only evidence supporting the existence and validity of the second lien is the parties' testimony and the botched promissory note.

Based upon the record, the jury could have reasonably inferred that: (1) Francisco truthfully completed a vague credit application; (2) Francisco did not know of a second lien on the trade-in truck; (3) Francisco, when confronted with the allegation of a second lien, had no reason to believe that the second lien was valid; and (4) Vaughan misrepresented the facts when he told the police that Francisco did not disclose a valid second lien that had to be paid before STF could perfect its title to the trade-in truck. Moreover, Vaughan's misrepresentation prompted the State's decision to prosecute because Sergeant Guerrero would not have investigated the case without it. *See First Valley Bank v. Martin*, 144 S.W.3d 466, 470 (Tex. 2004) (providing that in order for false information to satisfy the causation element of a malicious prosecution claim, it must be material to the decision to prosecution). We hold, therefore, that there is legally and factually sufficient evidence to support the causation element.

 2. *Probable Cause*

In malicious prosecution claims, there is a presumption that the defendant acted in good faith in reporting an apparent subversion of the law. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 794 (Tex. 2006). A claimant must rebut this presumption by producing evidence that the defendant initiated a prosecution on the basis of information or motives that do not support a reasonable belief that the claimant was guilty of the

14

charged crime. *See id*. at 794-95 (citing *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex. 1997)). Evidence of motives that undermine the presumption of reasonable belief include prior bad relations, preexisting debt, racial animus, or any private motivation to harm. *Id*. at 795.

Francisco posits that he rebutted the reasonableness presumption by presenting evidence that STF used the criminal justice system as a debt-collection tool. A time line of events shows that STF realized there was a possible problem with the title in January 1999. Thereafter, the Munizes alleged that they received vulgar and threatening phone calls from STF employees and Sergeant Guerrero. In March 1999, the Munizes filed for bankruptcy and STF was provided notice of the bankruptcy proceedings and an opportunity to file a claim, but it did not. In September 1999, Vaughan sent the letter, which led to criminal charges.

STF argues that Sergeant Guerrero's testimony that the police department does not collect debts and that Vaughan never asked him to collect a debt is conclusive evidence that STF acted only out of a reasonable belief that a crime had been committed. We disagree. Sergeant Guerrero's testimony regarding the allegedly criminal nature of Vaughan's communications and his investigation was evidence for the jury to weigh against the Munizes' testimony about how STF employees and Sergeant Guerrero treated them. A rational jury could have believed that STF vehemently wanted the money that it paid to Valley Trucking and that it employed the strong arm of the law when Francisco did not pay. Thus, the record contains legally and factually sufficient evidence to support the probable cause element.

3.    *Malice*

15

STF contends, without referencing any authority, that the evidence is insufficient to support the malice element of Francisco's malicious prosecution claim because in Question Five the jury did not find malice under a clear and convincing standard of proof. We disagree. A reasonable jury could have found malice under the lower, "preponderance of the evidence" standard and not found malice under the higher, clear and convincing evidence standard.[5] There is, therefore, legally and factually sufficient evidence supporting the malice element.

STF's first issue is overruled.

## D. Damages

By its second issue, STF contends there was legally and factually insufficient evidence to support the jury's finding of economic damages and mental pain rising to a legally compensable level. Francisco argues that the severe mental anguish he suffered is supported in the record and that STF inadequately briefed its challenge to the economic damages because it did not cite any legal authority. *See* TEX. R. APP. P. 38.1(i). While we agree that the briefing on the award of economic damages is lamentable, we nevertheless address the merits.

To recover mental anguish damages, a plaintiff must produce: (1) direct evidence of the nature, duration, or severity of a plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine; or (2) other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or

---

[5] STF also argues that the jury's answers are inconsistent because it provided different answers under different standards of proof. However, that issue is waived because STF did not timely object. *See* TEX. R. APP. P. 33.1; *Greater Houston Transp. Co. v. Zrubeck*, 850 S.W.2d 579, 586 (Tex. App.–Corpus Christi 1993, writ denied) (providing that "if the jury returns a verdict containing inconsistent answers, a party must make a proper objection or otherwise bring to the court's attention this fact before the verdict is accepted and received and the jury is discharged.").

anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). The jury "cannot simply pick a number and put it in the blank." *Id*. "There must be evidence that the amount found is fair and reasonable compensation." *Id*.

STF contends that the following exchange between Francisco and his attorney is the only evidence of mental anguish:

Q: How did you feel going through the [criminal] trial, sir?

A: During the trial, I was very tense. My stomach wanted to kind of betray me, but I contained myself. Right now I ask for an apology.

Q: How was life at home while the trial was going on?

A: Well, sad. Sometimes—sad, sometimes, with anger. I don't desire this for anybody when you know that you're innocent.

Francisco, however, gave more detailed testimony than that cited by STF. Francisco testified that he was embarrassed when Kingsville police officers arrested him in front of his friends and colleagues. Francisco was further embarrassed when he spent the weekend in jail, where he was strip-searched and forced to shower with other inmates. Thus, Francisco provided direct evidence of the "nature, duration, or severity" of his mental anguish. *See Parkway Co.*, 901 S.W.2d at 444.

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 807. The record in this case contains competent evidence indicating that Francisco's mental anguish was "more than mere disappointment, anger, resentment or embarrassment." *See Parkway Co.*, 901 S.W.2d

17

at 444. Giving credit to evidence supporting the judgment, and viewing the evidence in a neutral light, we find legally and factually sufficient evidence to support the jury's finding of compensable mental anguish damages. *See City of Keller*, 168 S.W.3d at 827; *Villagomez*, 210 S.W.3d at 748; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

STF's final sufficiency argument is that "the only testimony about losses in wages is" when Francisco testified that he earned between $250 to $300 a week. But, Francisco also testified that he could not work for practically six years because the criminal proceedings disrupted his work schedule. Additionally, Margarita testified that every court appearance cost Francisco a week's worth of work. By our math, $250 to $300 multiplied by fifty-two weeks, and then further multiplied by six years, equals $78,000 to $93,600. The jury's answer of $80,000 fell on the lower end of Francisco's testimony and was supported by ample evidence when viewed in either a favorable or neutral light.

STF's second issue is overruled.

### III. PREJUDGMENT INTEREST

By its third issue, STF contends the trial court erroneously concluded that prejudgment interest began on March 5, 2003. STF argues that Francisco's cause of action did not accrue until November 12, 2004, the date a jury acquitted him of theft charges. Francisco contends that STF first learned of his claim on August 6, 2002, when the suit that he subsequently nonsuited was originally filed.

We apply an abuse of discretion standard to review the trial court's award of prejudgment interest and give limited deference to the lower court's application of the law to the facts. *See Morales v. Morales*, 98 S.W.3d 343, 348 (Tex. App.–Corpus Christi 2003, pet. denied). Prejudgment interest begins to accrue on the earlier of: (1) 180 days after

18

the date the defendant receives written notice of a claim; or (2) the date suit is filed. Tex. Fin. Code Ann. § 304.104 (Vernon 2006); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 529 (Tex. 1998).

Citing *Leal v. American National Insurance Company* as authority on the issue, STF argues that Francisco's claim did not accrue until he was acquitted. 928 S.W.2d 592, 596-97 (Tex. App.–Corpus Christi 1996, writ denied). *Leal* dealt with the statute of limitations for bringing a malicious prosecution suit, and it held that when two indictments are returned on the same set of facts, the quashing or disposition of one without disposing of the other indictment does not constitute a termination of the prosecution in favor of the accused within the meaning of the rule relating to malicious prosecution. *See id.* at 597.

STF's reliance on *Leal* is misplaced because in that case, the grand jury issued multiple indictments on the same day based upon the same facts. *Id*. at 595. The *Leal* court rationalized that the statute of limitations did not begin to run until the remaining indictment had terminated. *Id*. In this case, two serial indictments were issued years apart, and the first indictment terminated in Francisco's favor in October, 2001. *See King v. Graham*, 47 S.W.3d 595, 603-05 (Tex. App.–San Antonio 2001, pet. granted) (concluding that a prosecutor's dismissal of an indictment was a termination in the malicious prosecution claimants' favor), *rev'd on other grounds by*, 126 S.W.3d 75 (Tex. 2003). Francisco filed suit in August 2002, but that suit was non-suited. Thus, the record supports the trial court's decision to begin prejudgment interest from March 5, 2003, because that date is 180 days after Francisco's claim initially accrued. The fact that the State re-indicted Francisco and proceeded to trial could have been seen by the trial court as an extension and exacerbation of the malicious prosecution claim but not a predicate to accruing the

19

claim.

STF's third issue is overruled.

## IV. Conclusion

The trial court's judgment is affirmed.

_____                    ROGELIO VALDEZ
                                           Chief Justice

Opinion delivered and filed on
this the 12th day of March, 2009.